866 A.2d 189

MERCHANTS EXPRESS MONEY ORDER COMPANY, PLAINTIFF–RESPONDENT/CROSS–APPELLANT, v. SUN NATIONAL BANK, DEFENDANT–APPELLANT/CROSS–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued December 1, 2004—Decided February 2, 2005.

Before Judges AXELRAD, HOLSTON, and BILDER.

*Ronald L. Glick* argued the cause for appellant/cross respondent (*Steven & Lee,* attorneys; *Mr. Glick and Christopher G. Barnes,* on the brief).

*Geoffrey B. Gompers* argued the cause for respondent/cross appellant (*Geoffrey B. Gompers & Associates,* attorneys; *Mr. Gompers,* on the brief).

The opinion of the court was delivered by

BILDER, J.A.D. (retired and temporarily assigned on recall).

Plaintiff Merchants Express Money Order Co. is a multi-state money transmitter which is licensed in New Jersey as "MEMO Money Order Company" to sell money orders to the public through retail establishments. MEMO provides its agents with blank money orders as well as equipment necessary to convert the blank money orders to negotiable instruments and to count the number and amount of money orders sold. The agents earn a percentage fee on the money orders sold.

Thurlow Checking, Inc. and Chelsea Check Cashing, L.P., companies with a common ownership, operated a check cashing business from a number of sites in Atlantic City and, among other things, also sold money orders and lottery tickets. Beginning in September 1998 Thurlow/Chelsea acted as money-order sales agents for plaintiff.

In connection with their businesses, Thurlow/Chelsea had banking relationships with defendant Sun National Bank that included operating accounts and separate money order accounts. The former contained, among other things, funds loaned by the bank as part of a line of credit as well as general operating funds; the latter was an account from which money-order-sales proceeds were transmitted on a weekly basis to plaintiff.

In October 2000, Thurlow/Chelsea's line of credit being seriously overdrawn, defendant Sun froze their bank accounts, seizing and applying the monies in those accounts to satisfy Thurlow/Chelsea's debts to Sun. As a result Thurlow/Chelsea was unable to wire transfer to plaintiff money-order-sales proceeds totaling $485,930.23. Contending the seized funds included these money-order-sales proceeds, plaintiff sued defendant Sun for their recovery. Defendant Sun appeals from a summary judgment finding it liable to plaintiff, assessing damages at $458,930.23 and entering judgment for that amount together with costs and interest from October 22, 2000. We affirm.

I.

A proper understanding of this case requires familiarity with the trade practices of Thurlow/Chelsea and the New Jersey Money Transmitters Act, *N.J.S.A.* 17:15C–1 to –27.

*Thurlow/Chelsea's trade practices.*

Proceeds from sales at Thurlow/Chelsea were initially deposited in general cash drawers at the sales sites. Moneys received from the sale of money orders were commingled with other receipts and cash received from the sale of money orders became available for

use in Thurlow/Chelsea's principal business of check cashing. On a regular basis, the contents of the cash drawers were deposited in the general operating funds accounts at Sun and on a weekly basis the amounts owed to MEMO were transferred into the money order accounts and from there wire transferred to MEMO.

*The New Jersey Money Transmitters Act.*

The Money Transmitters Act, *N.J.S.A.* 17:15C–1 to –27 provides for the licensing and regulation of persons engaged in the business of money transmission, a business which is defined as including, among other things, the sale or issuance of payment instruments for a fee. *N.J.S.A.* 17:15C–2.

Contained within that Act is a provision which makes funds received by agents such as Thurlow/Chelsea trust funds and continues the trust nature of the funds even if commingled until the proceeds are paid to the transmitter such as plaintiff.

*N.J.S.A.* 17:15C–18f provides as follows:

All funds (less fees) received by an authorized delegate of a licensee from the sale or delivery of a payment instrument issued by a licensee or received by an authorized delegate for transmission shall, from the time the funds are received by an authorized delegate until that time when the funds or an equivalent amount are remitted by the authorized delegate to the licensee, constitute trust funds owned by and belonging to the licensee. If an authorized delegate commingles any trust funds with any other funds or property owned or controlled by the authorized delegate, all commingled proceeds and other property shall be impressed with a trust in favor of the licensee in the amount equal to the amount of the proceeds due the licensee.

It is undisputed that plaintiff was an authorized licensee and Thurlow/Chelsea was an authorized delegate.

## II.

In a well reasoned oral decision of January 9, 2004 Judge Curio found that the evidence as to Thurlow/Chelsea's routine and habitual business practices, see *N.J.R.E.* 406, was unrebutted; examined *N.J.S.A.* 17:15C–18f and found the language clear and unambiguous; and finding there was no genuine dispute as to the material facts, i.e. the habit of commingling the receipts in the

cash drawer and regularly depositing the cash drawer receipts into the operating accounts at Sun, *Brill v. Guardian Life Ins. Co. of America,* 142 *N.J.* 520, 539–540, 666 *A.2d* 146 (1995); *Judson v. Peoples Bank & Trust Co. of Westfield,* 17 *N.J.* 67, 73–75, 110 *A.2d* 24 (1954), applied the provisions of the Act to conclude that the funds seized by Sun from the Thurlow/Chelsea operating accounts containing funds into which money order receipts had been commingled were impressed with a trust in favor of plaintiff to the extent of the amounts owed to it from money order sales.

> So all of the funds co-mingled and deposited by [Thurlow/Chelsea] into the Sun accounts are impressed with a trust in favor of MEMO to the tune of what's owed to MEMO. Only if there is a question as to whether those funds in the account were actually the result of the proceeds of the money order sales transaction does the Summary Judgment Motion get defeated. And the reality of the motion record is that there are suggestions and speculation that there may not be an ability of the plaintiff to prove that the funds came from the sale of money orders and were deposited into the accounts.

> But I have to say that when one looks at the motion record in its entirety, it's difficult to come to the conclusion that there is a genuine issue of material fact on that issue. I say that because clearly it is not disputed that the usual course of conduct between [Thurlow/Chelsea] and Sun was as it [has] previously been described. The monies for the business go into the operating account, come out of the operating account into the money order account, and go the wire transfer to MEMO, all monies from all transactions being co-mingled into the operating account.

## III.

On appeal Sun makes two contentions. First, that genuine issues exist as to whether and to what extent the funds it seized in the Thurlow/Chelsea operating accounts contained the proceeds of money order sales and second, that the trial court applied the Money Transmitters Act without consideration of the effect of the Uniform Fiduciaries Law, *N.J.S.A.* 3B:14–52 to –61, which, in reliance on *N.J.S.A.* 3B:14–58(a), it alleges immunizes it from liability in this case.

*The existence of genuine issues as to material facts.*

■ There is no dispute that Thurlow/Chelsea conducted their check cashing business at their several Atlantic City locations in

the manner we have previously described—that moneys received from money order sales as well as other receipts were placed in a single cash drawer and commingled. Sun concedes this in its brief. Its contention is that there came a time in October 2000 when Thurlow/Chelsea's principals' health prevented them from personally managing the operation, and that there is no evidence the normal practice continued after the principals ceased being present and Thurlow/Chelsea got into financial difficulty. It was the contention of the principals that large sums of money inexplicably vanished, perhaps by employee theft. Sun suggests the money might have been embezzled by the principals. Sun contends the alleged disappearance of money makes the continuation of the normal business practices at the Thurlow/Chelsea locations a matter which plaintiff must prove.

Sun's contentions are without merit. Thurlow/Chelsea's routine and habitual practices are fully established by the direct proofs of their usual course of conducting business, as well as corroborating evidence in the form of the business records of plaintiff with respect to Thurlow/Chelsea and of Sun with respect to Thurlow/Chelsea's deposits and wire transfers. The continuation of these practices until Sun's seizure of Thurlow/Chelsea's accounts is derived not only from habit and custom, *N.J.R.E.* 406, but also from common sense. The continued deposits in the Sun accounts and plaintiff's records of the Thurlow/Chelsea money order account clearly demonstrate the continuation of the operation. Indeed Sun does not contest this. There is no way the operation could have continued without the use of its cash drawers, whether cashing checks or selling money orders. As the trial judge noted, in rebuttal Sun has furnished no proofs to support its theories, merely speculative, hypothetical argument.

> But there's really been no evidence that would refute the consistent description by Lieberman [one of Thurlow/Chelsea's principals] as to how the monies were received, how they were deposited, and what happened now. Obviously the position, and the point is well made, that Mr. Lieberman, because of a variety of circumstances, may not be of sterling character and, therefore, his credibility may be called into question and may significantly be called into question, according to the position of the defense.

But when one considers that there are a variety of deposition transcripts, not one, not two, at least three, where the testimony of Lieberman is consistent under questioning by various persons as to how these accounts were handled and how the monies were co-mingled and how the transfers were made, that lends credibility.

When one considers that the forensic expert, albeit, obviously, hired by the plaintiff, corroborates, at least in some regard, the analysis of the documents that would support this interpretation and certainly demonstrates nothing that would suggest that there was something different going on for that finite period in and around October.

Also, the bank's statements corroborate, at least to some degree, the conclusion that these monies did come from the proceeds of sale of money orders, were co-mingled in the operating accounts and transferred, as described. The various documents that were generated and analyzed in connection with the bankruptcy case [1] corroborate, at least in some degree, this understanding of what was going on.

And I'm not suggesting that any one of those things, in and of themselves, are dispositive or conclusive on the issue. But taken together, the case is certainly made that the transaction and the course of dealing that had been ongoing and is not subject to dispute was not interrupted during the operative period, during the pertinent period. And when one takes those items, the Lieberman certification, the documents from the bankruptcy case, the trustee report, plaintiff's expert report, and looks at them in juxtaposition to what the defense has submitted to contradict them, the plaintiff's position becomes stronger, because the reality is that apart from saying that Lieberman is not credible there really is not anything beyond speculation and a bald denial of what Lieberman is saying.

\* \* \* \*

And there really has been nothing demonstrated by the defense that would suggest that there was any interruption in the usual course of dealing during that pertinent time when Lieberman was sick or involved in his wife's health care situation.

\* \* \* \*

And I also have to say most respectfully, that my note in the margin at one point as I was reading [the motion papers] was that it seemed to me that the hypothesis of the defense, that there was somehow something different about that very finite period of time from all that had gone before, which was not disputed in terms of how the monies were handled, really had sort of a sense of desperation to it.

---

[1] Following Sun's seizure of the Thurlow/Chelsea accounts, the principals [Mr. Lieberman and his wife] and Thurlow/Chelsea filed for protection under the bankruptcy laws.

■ Summary judgment is only appropriate when there are no genuine issues as to the material facts. *Brill v. Guardian Life Ins. Co. of America, supra,* 142 *N.J.* at 539–540, 666 *A.*2d 146; *Judson v. Peoples Bank & Trust Co. of Westfield, supra,* 17 *N.J.* at 73–75, 110 *A.*2d 24. However Sun was required to show by competent evidential material that a genuine issue of material fact did exist. *James Talcott, Inc. v. Shulman,* 82 *N.J.Super.* 438, 443, 198 *A.*2d 98 (App.Div.1964). Its speculation does not meet the evidential requirements which would allow it to defeat a summary judgment. *O'Loughlin v. National Comm. Bank,* 338 *N.J.Super.* 592, 606–607, 770 *A.*2d 1185 (App.Div.2001), *certif. denied,* 169 *N.J.* 606, 782 *A.*2d 424 (2001); *Talcott, supra,* 82 *N.J.Super.* at 443, 198 *A.*2d 98. Neither fanciful arguments nor disputes as to irrelevant facts will make an issue such as will bar a summary decision. *Judson, supra,* 17 *N.J.* at 73–75, 110 *A.*2d 24.

We agree with Judge Curio that the material facts are not disputed and that no genuine disputes exist which would bar summary judgment. We are satisfied there is no relevant issue upon which reasonable minds could differ. *Brill, supra,* 142 *N.J.* at 540, 666 *A.*2d 146.

*The application of the Money Transmitters Act.*

■ Sun claims error in the failure of the trial judge to afford it the protections to which it contends it is entitled by virtue of *N.J.S.A.* 3B:14–58a which protects a bank from responsibility for monitoring a fiduciary's disposition of funds in its fiduciary account as long as it does not have knowledge of facts that make its action in receiving a deposit or paying a check amount to bad faith. *Leeds v. Chase Manhattan Bank,* 331 *N.J.Super.* 416, 425, 752 *A.*2d 332 (App.Div.2000). Sun disclaims any knowledge of any breach of fiduciary duty owing by Thurlow/Chelsea to plaintiff by virtue of the deposits in the Thurlow/Chelsea account or that it had any reason to know that accepting the deposits would constitute bad faith. In making this contention Sun misapprehends the nature of plaintiff's claim and the effect of section 18 of the Money Transmitters Act. There is no claim here of defalcations by

Thurlow/Chelsea. They regularly deposited the proceeds of the money order sales in Sun and wire transferred them in a timely manner to plaintiffs. This process ceased only when Sun seized Thurlow/Chelsea's bank accounts and disabled the transmission of these funds to plaintiff. Plaintiff's contention, simply stated, is Sun seized trust funds owned by it.

Similarly without merit are Sun's contentions that the trust funds lost their trust nature when commingled in Thurlow/Chelsea's bank accounts—that the trial court's interpretation of the Money Transmitters Act was incorrect.

Absent a clear indication to the contrary, language in a statute is to be read in accordance with its plain and ordinary meaning. *Service Armament Co. v. Hyland,* 70 *N.J.* 550, 556, 362 *A.*2d 13 (1976); *also State v. S.R.,* 175 *N.J.* 23, 31, 811 *A.*2d 439 (2002).

> In her oral opinion the trial judge said:
>
> Under typical and well-settled statutory construction principles, the Money Transmitters Act is certainly clear and unambiguous.
>
> And ... the critical fact ... in the analysis is that it talks about the ownership of those funds. In fact to be frank about it, that statute is really a model of clarity. And since it's my view that the UFL addresses a different situation [liability of a bank for a fiduciary's malfeasance], there's not the irreconcilable tension between the two that would require some sort of artful act of interpretation.

We fully agree.

Moreover we are persuaded that even if we were to examine beyond the statute's clear and unambiguous terms and seek to divine the legislative purpose, *see State v. S.R., supra; City of Newark v. County of Essex,* 160 *N.J.Super.* 105, 113, 388 *A.*2d 1311 (App.Div.1978), *aff'd* 80 *N.J.* 143, 402 *A.*2d 916 (1979)(in construing a statute the court must consider the legislative purpose), we would arrive at the same conclusion. As with most New Jersey statutes, legislative history is sparse. *In the Matter of the Estate of Hersh,* 195 *N.J.Super.* 74, 78, 477 *A.*2d 1286 (App.Div. 1984), *certif. denied,* 99 *N.J.* 185, 491 *A.*2d 689 (1984). We do find however that its language is similar to that of a Model Act Regulating Money Transmitters written by an industry group known as the Non–Bank Funds Transmitter Group and adopted

by some thirteen states. Judith Rinearson, *Regulation of Electronic Stored Value Payment Products Issued by Non–Banks Under State "Money Transmitter" Licensing Laws,* 58 *Bus. Law.* 317, 319 (November 2002). We entertain no doubt its passage was impelled not only by the felt need for regulation of the industry (Statement attached to A956 of 1998) but also by a desire to enhance the ability of New Jersey citizens to obtain money orders at affordable cost. By impressing a trust on the commingled proceeds of money order sales in *N.J.S.A.* 17:15C–18f, the legislature eliminated the need for policing, thus enhancing the availability of money orders at retail outlets and by reducing the risk and cost to the money order company, reducing the cost to the consumer.

We agree with the trial judge that

What happened is that the bank seized money to satisfy the debt of [Thurlow/Chelsea], which was money not belonging to [Thurlow/Chelsea]. It was money belonging to another entity, of course, MEMO, and not something that the bank had the right to seize to satisfy the debt of [Thurlow/Chelsea]. So at the risk of over-simplifying it, this money is not [Thurlow/Chelsea's], therefore, clearly, under the Money Transmitters Act. And, therefore, the bank had no right to seize it to satisfy the debts of [Thurlow/Chelsea].

Affirmed.