NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2342-17T3

CHARLES L. BOVE,

     Plaintiff-Appellant,

v.

AKPHARMA INC., a/k/a PRELIEF
INC. and ALAN E. KLIGERMAN,

     Defendants-Respondents.

_____

> **APPROVED FOR PUBLICATION**
>
> **July 11, 2019**
>
> **APPELLATE DIVISION**

Argued May 21, 2019 – Decided July 11, 2019

Before Judges Fisher, Suter and Enright.

On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Docket No. L-0982-15.

Neil M. Mullin argued the cause for appellant (Smith Mullin, PC, and Niedweske Barber LLC, attorneys; Neil M. Mullin and Kevin Edward Barber, of counsel; Nancy E. Smith, on the brief).

Roberto A. Rivera-Soto argued the cause for respondents (Ballard Spahr LLP, attorneys; Roberto A. Rivera-Soto and Casey Gene Watkins, of counsel and on the brief).

Deborah Lynn Mains argued the cause for amicus curiae New Jersey Association for Justice (Costello &

Mains, LLC, attorneys; Deborah Lynn Mains, on the brief).

The opinion of the court was delivered by

ENRIGHT, J.S.C. (temporarily assigned).

Plaintiff, Charles L. Bove, appeals from an order granting summary judgment to defendants, AkPharma Inc. and its CEO, Alan Kligerman, and denying his motion to strike defendants' affirmative defense under the Workers' Compensation Act (WCA), N.J.S.A. 34:15-1 to -146. Bove also appeals from an order entering judgments for sanctions against his attorneys under Rule 1:4-8. We affirm the two rulings granting summary judgment and denying Bove's motion to strike, but reverse the order imposing sanctions.

In November 2013, Bove filed a workers' compensation claim and then in August 2014, he filed a companion civil suit against AkPharma Inc. and Kligerman. Both actions involved claims arising from Bove's use of a nasal spray product called "NasoCell." Bove's civil complaint was dismissed without prejudice so the parties could explore alternative dispute resolution, but when attempts at settlement failed, Bove refiled his civil complaint in April 2015. In his complaint, Bove alleged defendants were liable for fraudulent concealment, battery, and prima facie tort, based on Bove's use of NasoCell. In response to the refiled complaint, on May 5, 2015, defendants' counsel sent Bove's counsel

a "safe harbor" letter, per Rule 1:4-8(b)(1). That letter made no mention of Bove's separate workers' compensation petition nor the exclusivity bar under the WCA. Instead, the letter generally indicated Bove's factual allegations about his use of NasoCell were contrary to the evidence and that there was no scientific evidence linking his alleged injuries to NasoCell. The "safe harbor" letter also contended Bove's legal claims were contrary to New Jersey law and were "governed exclusively by the New Jersey Product Liability Act" (PLA), N.J.S.A. 2A:58C-1 to -11. In response to this letter, Bove's counsel filed an amended complaint, outlining five causes of action, namely, fraudulent concealment, battery, prima facie tort, strict products liability/design defect, and strict liability/failure to warn.

In July 2015, defendants moved to dismiss the amended complaint or, alternatively, for summary judgment based on the WCA bar. On April 19, 2016, the court dismissed the prima facie tort action, denied dismissal as to the other counts and denied, without prejudice, defendants' motion for summary judgment. Shortly thereafter, the trial court ordered discovery limited to the application of the WCA litigation bar. In October 2016 and March 2017, supplemental orders were entered to extend discovery and to allow Bove's counsel time to engage a scientific expert.

In June 2017, Bove filed a motion to strike defendants' affirmative defense of the WCA's litigation bar. Defendants opposed this motion and renewed their request for summary judgment. The trial court then conducted a five-day evidentiary hearing in July 2017, to determine whether Bove could proceed with his civil suit or was barred from doing so under the WCA. The trial court heard testimony from Bove, Kligerman, and their respective experts during this hearing.

On August 4, 2017, the trial court denied Bove's motion to strike defendants' affirmative defense of the WCA's litigation bar and granted defendants' motion for summary judgment. Defendants then timely moved for a frivolous litigation award, seeking reimbursement in the sum of $702,819.87 for counsel fees, costs and expert fees. On December 13, 2017, the trial court partially granted defendants' request for sanctions and entered judgments against Bove's attorneys amounting to $205,147.82. Each firm representing Bove was directed to pay half of this award.

Bove appeals from the August 4, 2017 and December 13, 2017 orders. The New Jersey Association for Justice (NJAJ) joins in his appeal, as amicus curiae.

The two opinions accompanying the orders at issue reflect extensive fact-

findings, which we need not repeat here. Instead, we highlight only those facts salient to our analysis and note the trial court accurately captured the testimony of the parties and their experts, including the error committed by Bove's expert in misreading the content and meaning of a Food & Drug Administration (FDA) public notice about "Nasal Moisturizer Drug Products."

According to the testimony from the evidentiary hearing, Bove was hired by Kligerman in 2003 on a part-time basis. Soon, he became a full-time employee and the Director of Clinical Studies at AkPharma. By 2007, he was engaged in discussions with Kligerman about NasoCell, the nasal spray product Kligerman had developed. NasoCell was comprised of calcium glycerophosphate (CGP) and distilled water. Kligerman used this product personally and decided to put the mixture into a spray bottle. He claimed NasoCell helped him with his asthma and that several of his family members also used NasoCell.

The testimony from the evidentiary hearing confirms Kligerman suggested Bove and other AkPharma employees use NasoCell spray. It is uncontroverted that some employees declined to use NasoCell but Bove agreed to try it. He used NasoCell from 2007 to as late as 2010, documented the effects he observed while using this product, and submitted his observations to

Kligerman. The record reflects Bove often used NasoCell outside the workplace and in his home, and he provided many positive reviews about his use of NasoCell.

When NasoCell's ingredients were modified and the product became known as "NasoCell-S," Bove continued to use this modified product. The record shows Bove's use of NasoCell-S was unsupervised, except on one occasion when Bove testified he felt pressured to use the product because Kligerman followed him into a bathroom at work to watch him use it. However, on cross-examination, Bove conceded "nobody had a gun to (his) head" to use the product and he "did it for Alan (Kligerman)." The record also reflects that in January 2008, Bove completed a survey at work, advising he wanted to continue to be a panelist to study NasoCell and to receive another bottle of the spray. Bove was unsure when he stopped using NasoCell, but did not believe he used it after defendants received a "full clinical hold letter" from the FDA in 2010, testifying, "I pretty much washed my hands of it after that."

For his part, Kligerman denied pressuring Bove at any time to use NasoCell and testified Bove was enthusiastic about the product. Kligerman also testified he personally used NasoCell several times a week, starting in 2007, and as of the time of the evidentiary hearing, he and his family members continued

6

to use NasoCell on a regular basis with no negative effects. Kligerman was unwavering in his testimony that NasoCell was safe and that Bove voluntarily used the product. Further, there was no evidence presented at the hearing of any adverse action taken against Bove or other employees at AkPharma who declined to use NasoCell or started but then stopped using NasoCell.

In August 2010, AkPharma received a full clinical hold letter from the FDA, essentially placing a hold on any further clinical study of NasoCell as a drug until certain stated deficiencies were cured. There is no dispute Bove knew NasoCell did not have FDA approval before he used the product. Concerned about incurring additional expenses, AkPharma discontinued development of NasoCell as a drug and explored its development as a cosmetic. However, NasoCell never got past the early planning and development stage, it was not marketed to the public, and ultimately, it was abandoned by defendants altogether.

In 2011, AkPharma terminated Bove and other employees as part of a workforce reduction. Then, in 2013, Bove was diagnosed with permanent endocrine failure and a colon tumor. Following these diagnoses, Bove researched the ingredients that had been used in NasoCell, such as CGP and parabens, and concluded his use of NasoCell had caused his health problems.

A-2342-17T3

He also asserted a number of medical professionals had connected his use of NasoCell to his ailments, but did not present any reports to support this contention.

Based on these facts, the trial court granted defendants summary judgment in August 2017, finding Bove did not "vault" the exclusivity provision of the WCA. It explained Bove's proofs did not show that: (1) Kligerman knew his actions were substantially certain to result in injury or death to plaintiff; or (2) Bove's injuries and the circumstances of their infliction were more than a fact of life of industrial employment and beyond what the Legislature intended the WCA to immunize. The trial judge also stated that as AkPharma's Clinical Studies Manager, Bove's "involvement in the early stages of new products was apparently part of his duties." The trial judge found Bove: used NasoCell at work and at home; he made positive findings regarding its effectiveness; and then ceased using it, years prior to his initial workers' compensation petition. Moreover, the trial court noted that several years after Bove stopped using NasoCell, he had no medical evidence to support his claim that NasoCell caused his health problems.

On the other hand, the trial court found Kligerman "was, and remains, very confident of the safety of the conduct he asked plaintiff to engage in. Not

only has [Kligerman] used NasoCell regularly for the past several years, he has encouraged his family members to do so." Based on these and other observations, the trial judge concluded that "[s]uch are not the circumstances to support a civil claim for personal injuries by an employee against an employer" and there is no basis to waive the "cloak of immunity afforded an employer under the WCA." Additionally, the trial court determined "there are no facts in dispute that might support a finding by a reasonable jury that AkPharma knew with virtual certainty that Mr. Bove had been required to engage in conduct that would be harmful to him," adding, "the evidence is so one-sided that it is inconceivable that a jury would find that [d]efendant was substantially certain that [p]laintiff would suffer harm from his use of NasoCell." Thus, the trial court granted summary judgment in defendants' favor.

We review the trial court's decision granting summary judgment de novo, using the identical standard that governs the trial court. Townsend v. Pierre, 221 N.J. 36, 59 (2015). We owe no deference to the motion judge's conclusions on issues of law. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995). Additionally, we review the record "based on our consideration of the evidence in the light most favorable to the parties opposing

summary judgment." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523 (1995).

Rule 4:46-2(c) provides that a court should grant summary judgment when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." Thus, a summary judgment motion should be denied if the non-moving party comes forward with evidence that reflects a "genuine issue as to any material fact challenged." Brill, 142 N.J. at 529.

A summary judgment motion is not defeated simply by pointing to any fact in dispute. Ibid. Also, self-serving assertions unsupported by evidence are "insufficient to create a genuine issue of material fact." Miller v. Bank of Am. Home Loan Servicing, L.P., 439 N.J. Super. 540, 551 (App. Div. 2015) (quoting Heyert v. Taddese, 431 N.J. Super 388, 414 (App. Div. 2013)). "Competent opposition requires 'competent evidential material' beyond mere 'speculation' and 'fanciful arguments.'" Hoffman v. Asseenontv.Com, Inc., 404 N.J. Super. 415, 426 (App. Div. 2009) (quoting Merchs. Express Money Order Co. v. Sun Nat'l Bank, 374 N.J. Super. 556, 563 (App. Div. 2005)).

Bove argues he presented sufficient evidence that defendants acted with intent to commit battery and fraud, which acts should have allowed him to "vault" the exclusivity bar under the WCA. He also complains it was error for the trial court to obligate him to submit expert testimony or medical records regarding proximate cause in light of the limited scope of discovery ordered before the plenary hearing. Additionally, he complains the trial court should not have considered the expert testimony of Dr. Margaret Weis, due to her financial interest in defendants' business.

The WCA compensates employees for personal injuries caused "by accident arising out of and in the course of employment[.]" N.J.S.A. 34:15-7. It authorizes benefits "irrespective of the fault of the employer or contributory negligence and assumption of risk of the employee." Harris v. Branin Transp., Inc., 312 N.J. Super. 38, 46 (App. Div. 1998). The WCA has been described by our Supreme Court "as an historic 'trade-off.'" Laidlow v. Hariton Mach. Co., Inc., 170 N.J. 602, 605 (2002). By implied agreement, employees volunteer to give up their right to pursue common law remedies for work-related injuries and illnesses, in return for an automatic entitlement to a limited recovery. Ibid. See N.J.S.A. 34:15-1 to -146. Similarly, the employer accepts strict liability for

workplace injuries in return for limited and definite financial exposure. The exclusive remedy provision of the WCA states:

> If an injury or death is compensable under this article, a person shall not be liable to anyone at common law or otherwise on account of such injury or death for any act or omission occurring while such person was in the same employ as the person injured or killed, except for intentional wrong.
>
> [N.J.S.A. 34:15-8.]

The statutory language of the WCA involving an exception for intentional wrongs was added in 1961. The Sponsor's Statement accompanying the amendment explained, in part:

> The bill seeks to prevent common law actions by representatives of the injured person against the employer even though the injured person is receiving or is entitled to receive the benefits under the Workmen's Compensation Act by specifically limiting the employer's liability to the provisions of the act.
>
> This bill also seeks to protect a workman from the threat of suit or from actual suit in situations where the remedy should be obtained from the employer through workmen's compensation alone, since there is a growing trend whereby a workman, after receiving benefits under the Worker's Compensation Act, then starts a common law suit against his fellow workers, superintendent or foreman, or against the officers and directors of the company for whom he worked, thus exposing them to the expense of having to defend such suits and the possibility of having to pay substantial damages.

[<u>Sponsor's Statement to A. 277</u> 7 (<u>L</u>. 1961, <u>c</u>. 2).]

The legislative history of the WCA does not specifically explain why the phrase, "intentional wrong," was included in the Act, as opposed to "intentional tort." Nonetheless, it appears the first definition of "intentional wrong," was referenced in <u>Bryan v. Jeffers</u>, 103 N.J. Super. 522, 523-24 (App. Div. 1968), where we said our Legislature intended the words, "intentional wrong," to have "their commonly understood signification of deliberate intention." <u>Ibid.</u> Thus, we found the "policy objective sought by the 1961 amendment would not be attained if the exception for 'intentional wrong' were construed to leave open a loophole for such actions against fellow employees in the guise of claims for 'gross negligence.'" <u>Id.</u> at 523. <u>See also</u> <u>Millison v. E.I. du Pont de Nemours & Co.</u>, 101 N.J. 161, 171 (1985) (holding that a defendant does not engage in an intentional wrong when he is negligent by acting in the belief or consciousness that the act is causing an appreciable risk of harm to another or when the defendant is acting recklessly or wantonly facing an even greater risk). Accordingly, the phrase, "intentional wrong," has been given a narrow construction. <u>Copeland v. Johns-Manville Prods. Corp.</u>, 492 F. Supp. 498, 501 (D.N.J. 1980).

The intentional wrong exception to the exclusivity bar under the WCA was analyzed by our Supreme Court in Millison, 101 N.J. at 181-82, where the Court found an employer fraudulently concealed employees were suffering from asbestos-related diseases (thereby delaying treatment and aggravating their existing illnesses). The Millison Court determined such behavior constituted an intentional wrong under the WCA. Still, the Court recognized that:

> the statutory scheme contemplates that as many work-related disability claims as possible be processed exclusively within the Act. Moreover, if "intentional wrong" is interpreted too broadly, this single exception would swallow up the entire "exclusivity" provision of the Act, since virtually all employee accidents, injuries, and sicknesses are a result of the employer or a co-employee intentionally acting to do whatever it is that may or may not lead to eventual injury or disease.

> [Id. at 177.]

The Millison Court emphasized the concept of "intentional wrong" encompassed more than a subjective intention to injure. In considering what level of risk and exposure to danger was "so egregious as to constitute an 'intentional wrong,'" the Court concluded that mere knowledge and appreciation of a risk of harm to an employee cannot be considered intent. Ibid. It then adopted a "substantial certainty" standard to establish the commission of an intentional wrong. Id. at 178. Under that standard, the Court held a plaintiff

A-2342-17T3

had to establish two elements: (1) the employer must knowingly expose the employee to a substantial certainty of injury (i.e., the "conduct" prong); and (2) the resulting injury must not be "a fact of life of industrial employment," and must be "plainly beyond anything the legislature" intended the Act to immunize (i.e. the "context" prong). Id. at 178-79. The substantial-certainty standard will be met only if "both prongs . . . are proved." Laidlow, 170 N.J. at 605. The Millison Court clarified that whenever an employer is a corporation, "the employer can act only through its employees, so for practical purposes, actions taken by certain corporate officers and supervisors are actions taken by the corporate-employer." Millison, 101 N.J. at 185.

The Laidlow Court reiterated the substantial-certainty standard when it examined the intentional wrong exception in the context of an industrial accident. Laidlow, 170 N.J. at 608. The Court held the employer in Laidlow acted with knowledge it was substantially certain a worker would suffer an injury when an employee tied a safety guard on a rolling mill, releasing it only when Occupational Safety and Health Administration (OSHA) inspectors were present, and although no injuries had occurred in the past, there had been several close calls reported to the employer. Id. at 620-22. The Court concluded an

employee injury under these circumstances would never constitute the "simple facts of industrial life." Id. at 622.

More recently, in Van Dunk v. Reckson Associates Realty Corp., 210 N.J. 449, 474 (2012), our Supreme Court held the WCA's exclusivity bar applied, even though the workplace accident produced an OSHA citation for a "willful" violation of OSHA safety rules. In that case, the plaintiff, a construction worker, was injured when a trench collapsed on him at his worksite. Id. at 454. The unsupported trench was excavated too deeply for a worker to safely enter without safety equipment, according to OSHA safety rules, as well as the employer's own safety program. Id. at 454. Still, the Van Dunk Court held "that the finding of a willful violation under OSHA is not dispositive of the issue of whether the employer in this case committed an intentional wrong." Id. at 470. As to the conduct prong of the substantial-certainty standard, the Court explained that "[a] probability, or knowledge that [ ] injury or death 'could' result, is insufficient." Ibid. Instead, the "intentional wrong must amount to a virtual certainty that bodily injury or death will result." Ibid. Moreover, as to the context prong, the Court observed the "high threshold" of this prong was not met by "the type of mistaken judgment by the employer and ensuing employee accident that occurred on [the] construction site." Id. at 474. In short, the Van

Dunk Court found that while the knowing failure to take safety precautions was an "exceptional wrong," it was not the type of egregious conduct associated with an intentional wrong. Id. at 472.

Reviewing these cases together, it is apparent that in addition to violations of safety regulations or failure to follow good safety practice, an intentional wrong will be found when it is accompanied by something more, such as deception, affirmative acts that defeat safety devices, or a willful failure to remedy past violations. See Laidlow, 170 N.J. at 616 (noting that the "mere toleration of workplace hazards 'will come up short' of substantial certainty") (quoting Millison, 101 N.J. at 179). As the Van Dunk Court observed when discussing the conduct prong analysis, "[w]hat distinguishes Millison, Laidlow, Crippen [v. Cent. Jersey Concrete Pipe Co., 176 N.J. 397, 409-10 (2003)] and Mull [v. Zeta Consumer Products, 176 N.J. 385, 192 (2003)] from the present matter is that those cases all involved the employer's affirmative action to remove a safety device from a machine, prior OSHA citations, deliberate deceit regarding the condition of the workplace, machine, or, in the case of Millison, the employee's medical condition, knowledge of prior injury or accidents, and previous complaints from employees." Van Dunk, 210 N.J. at 471.

A-2342-17T3

This case is in sharp contrast to the types of cases cited by the Van Dunk Court. Here, Bove asserts defendants were not entitled to summary judgment, as they committed battery, by repeatedly requiring him to inhale NasoCell, and fraud, by falsely conveying to him that all ingredients in NasoCell were safe. However, his mere allegations of battery or fraud do not automatically vault the WCA exclusivity bar. Even "conduct that would be considered reckless or intentional under general tort law may result in injuries covered by the WCA[.]" Vitale v. Schering-Plough Corp., 447 N.J. Super. 98, 115 (App. Div. 2016), aff'd as modified, 231 N.J. 234 (2017).

What is more, the elements of an "intentional wrong" are not coextensive with the elements of common law intentional torts, such as battery and fraud. For example, a battery claim may be asserted based on "any nonconsensual touching" and does not require intent to injure. Perna v. Pirozzi, 92 N.J. 446, 459-65 (1983). Thus, not all battery claims by an employee against his or her employer will satisfy the first prong of the Millison standard.

Here, Bove's proofs did not show Kligerman either physically touched him or used his authority and power to force Bove to use NasoCell. Instead, Bove admitted to using NasoCell at work and at home and on cross-examination, he conceded no one "forced" him to use NasoCell. Bove also acknowledged he

participated in the study "for Alan (Kligerman)," and Kligerman never said "if you don't try it, you're going to lose your job." Moreover, in 2008, after having used NasoCell repeatedly and aware it had not been approved by the FDA, Bove signed a form indicating he wanted to continue as a panelist in studying the effects of NasoCell and wanted another bottle of NasoCell. The proofs similarly confirmed, without contradiction, that Bove continued to be employed by defendants after he stopped using NasoCell, and that other employees who declined to use or stopped using NasoCell suffered no negative repercussions from defendants. Further, Kligerman used NasoCell before he asked Bove to try it and Kligerman used NasoCell long after Bove stopped using the product. As the trial court noted, these were not the type of circumstances demonstrating Kligerman was "substantially certain" that injury or death would be suffered by Bove from using NasoCell.

Turning to Bove's claim of fraud, he had to prove: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." Gennari v. Weichert Co. Realtors, 148 N.J. 582, 610 (1997). As correctly determined by the trial judge, no fraud was committed in this instance because

no material misrepresentation was made—the ingredients in NasoCell were generally regarded as safe and were not among the FDA's list of unsafe cosmetic ingredients. Bove presented no evidence to the contrary. Moreover, the trial court's determination that Kligerman was, and remains, very confident in the safety of NasoCell was overwhelmingly supported by the record. Indeed, it was uncontroverted Kligerman and his family members used NasoCell for years, with no injuries reported from its use.

While Bove sought to equate defendants' intentional acts to the more egregious acts referenced by the Van Dunk Court, we find the trial court's rejection of his claims amply supported by the record. That is to say, we find no error in its analysis of the conduct prong under Millison regarding defendants' acts, for purposes of exposure to a civil suit.

To the extent Bove complains the trial court erred when citing to his failure to provide medical causation testimony, we disagree. Indeed, the first prong of the two-prong substantial certainty test articulated in Millison confirms an employer must know its actions are "substantially certain" to result in injury or death to the employee. Millison, 101 N.J. at 178-79. Thus, if a plaintiff cannot demonstrate the employer was aware the conduct at issue was substantially certain to result in injury, that plaintiff cannot satisfy the first prong

20

of <u>Millison</u>. Bove was properly held to this same standard by the trial court. However, his proofs fell far short of satisfying the conduct prong, as he presented no evidence to support his contention defendants were substantially certain his use of NasoCell would result in injury or death. Moreover, Bove provided no proofs his alleged injuries resulted from defendants' actions. On the other hand, defendants addressed the conduct prong and presented evidence the ingredients in NasoCell were generally regarded as safe by the FDA and that the use of such ingredients in consumer products was widespread. Additionally, they presented expert testimony accepted by the trial court that it was highly unlikely NasoCell's ingredients caused any of the ailments complained of by Bove. Thus, we are satisfied that when the trial court mentioned Bove's lack of medical proofs, it did so, cognizant of its central inquiry, i.e., whether defendants were substantially certain death or injury would result from Bove's use of NasoCell.

We note that whether NasoCell was a cosmetic or a drug while Bove used the product was extensively addressed by the parties' experts. However, a review of the lengthy expert testimony provided on this issue was of little assistance to us in resolving whether defendants "knowingly exposed plaintiff to a substantial certainty of injury," i.e., the first prong of the <u>Millison</u> standard.

21

Millison, 101 N.J. at 178-79. At any rate, we find no error in the trial court's assessment of how defendants developed and then abandoned NasoCell before it could be marketed as a drug or cosmetic. Similarly, the record supports the trial court's conclusion that Bove's own expert erred in relying on a misunderstanding of the FDA's 2003 "Call for Data," in an effort to support Bove's claims of defendants' liability for intentional wrongs.

As there was no evidence to suggest defendants were substantially certain death or injury would result from Bove's use of NasoCell, it is unnecessary to analyze the second prong of the "substantial certainty" standard, i.e. the resulting injury must not be a "fact of life of industrial employment" and must be plainly beyond anything the Legislature intended the WCA to immunize. Millison, 101 N.J. at 178-79. We do not address this context prong because, again, the exclusivity bar of the WCA will only be vaulted if both the conduct and context prongs are proven. Laidlow, 170 N.J. at 605. Additionally, we are satisfied there is no likelihood further discovery would "supply the missing elements of the cause of action" to vault the WCA's exclusivity bar. Badiali v. N.J. Mfrs. Ins. Grp., 220 N.J. 544, 555 (2015). Therefore, we find no error in the trial court's decision to grant defendants summary judgment, notwithstanding Bove's assertions that defendants committed "intentional wrongs" against him.

22

Next, we turn to the award of sanctions against plaintiff's counsel. We review the trial judge's decision on a motion for frivolous lawsuit sanctions under an abuse of discretion standard. McDaniel v. Man Wai Lee, 419 N.J. Super. 482, 498 (App. Div. 2011). Reversal is warranted "only if [the decision] 'was not premised upon consideration of all relevant factors, was based upon consideration of irrelevant or inappropriate factors, or amounts to a clear error in judgment.'" Ibid. (quoting Masone v. Levine, 382 N.J. Super. 181, 193 (App. Div. 2005)). Governed by these standards, and mindful of Bove's failure to marshal proofs sufficient to vault the exclusivity bar under the WCA, we reverse the sanctions imposed on Bove's counsel. We do so because the trial court did not fully appreciate the temporal limitation associated with such sanctions and because defendants' "safe harbor" letter of May 5, 2015 neglected to warn Bove that his action was barred by the WCA. Additionally, there was no finding as to whether Bove's counsel held an objectively reasonable belief in the merits of Bove's claims. Accordingly, we reverse the sanctions against Bove's attorneys on these bases.

Sanctions for frivolous litigation against a party are governed by the Frivolous Litigation Statute, N.J.S.A. 2A:15-59.1. See also Rule 1:4-8 (authorizing similar fee-shifting consequences as to frivolous litigation conduct

by attorneys). N.J.S.A. 2A:15-59.1 and Rule 1:4-8 provide limited exceptions to the "American Rule" for civil justice, whereby litigants are expected to bear their own counsel fees. Our courts traditionally have adhered strictly to the American Rule because "sound judicial administration will best be advanced by having each litigant bear his own counsel fees." First Atlantic Federal Credit Union v. Perez, 391 N.J. Super. 419, 425 (App. Div. 2007) (citing Gerhardt v. Continental Ins. Co., 48 N.J. 291, 301(1966)). As a consequence, we have approached fee-shifting requests under the Frivolous Litigation Statute and Rule 1:4-8 restrictively, because "the right of access to the court should not be unduly infringed upon, honest and creative advocacy should not be discouraged, and the salutary policy of the litigants bearing, in the main, their own litigation costs, should not be abandoned." Gooch v. Choice Entertaining Corp., 355 N.J. Super. 14, 18 (App. Div. 2002) (citation omitted).

Under the Frivolous Litigation Statute, a court is permitted to award reasonable attorney's fees and litigation costs to a prevailing party in a civil action if the court finds "at any time during the proceedings or upon judgment that a complaint, counterclaim, cross-claim or defense of the non-prevailing person was frivolous." N.J.S.A. 2A:15-59.1(a)(1). Similarly, Rule 1:4-8 provides for the imposition of sanctions where an attorney or pro se party filed

a pleading or a motion with an "improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation[,]" Rule 1:4-8(a)(1), or by asserting a claim or defense that lacks the legal or evidential support required by Rule 1:4-8(a)(2), (3) and (4). State v. Franklin Sav. Account No. 2067, 389 N.J. Super. 272, 281 (App. Div. 2006).

"For purposes of imposing sanctions under Rule 1:4-8, an assertion is deemed 'frivolous' when 'no rational argument can be advanced in its support, or it is not supported by any credible evidence, or it is completely untenable.'" United Hearts, LLC v. Zahabian, 407 N.J. Super. 379, 389 (App. Div. 2009) (quoting First Atlantic, 391 N.J. Super. at 432).

Sanctions imposed under this rule "are specifically designed to deter the filing or pursuit of frivolous litigation[.]" LoBiondo v. Schwartz, 199 N.J. 62, 98 (2009). A second purpose of the rule is to compensate the opposing party in defending against frivolous litigation. Toll Bros., Inc. v. Twp. of W. Windsor, 190 N.J. 61, 71 (2007). However, because the nature of litigation conduct warranting sanctions under Rule 1:4-8 has been strictly construed, Pressler & Verniero, Current N.J. Court Rules, cmt. 2 on R. 1:4-8 (2019), Rule 1:4-8 sanctions will not be imposed against an attorney who mistakenly files a claim in good faith. Horowitz v. Weishoff, 346 N.J. Super. 165, 166-67 (App. Div.

2001); see also First Atlantic, 391 N.J. Super. at 432 (holding that an objectively reasonable belief in the merits of a claim precludes an attorney fee award); and K.D. v. Bozarth, 313 N.J. Super. 561, 574-75 (App. Div. 1998) (declining to award attorney's fees where there is no showing the attorney acted in bad faith). "That some of the allegations made at the outset of litigation later proved to be unfounded does not render frivolous a complaint that also contains some non-frivolous claims." Iannone v. McHale, 245 N.J. Super. 17, 32 (quoting Romero v. City of Pomona, 883 F. 2d 1418, 1429 (9th Circ. 1989)); see also Wyche v. Unsatisfied Claim & Judgment Fund, 383 N.J. Super. 554, 560 (App. Div. 2006) (finding fees properly denied where plaintiff was legitimately seeking to extend the law on a theretofore undecided issue).

Rule 1:4-8 provides that the signature of an attorney or pro se party on a "pleading, written motion, or other paper" certifies that to the best of his or her knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

> (1) the paper is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;
>
> (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a non-frivolous argument for the extension, modification, or

reversal of existing law or the establishment of new law;

(3) the factual allegations have evidentiary support or, as to specifically identified allegations, they are either likely to have evidentiary support or they will be withdrawn or corrected if reasonable opportunity for further investigation or discovery indicates insufficient evidentiary support; and

(4) the denials of factual allegations are warranted on the evidence or, as to specifically identified denials, they are reasonably based on a lack of information or belief or they will be withdrawn or corrected if a reasonable opportunity for further investigation or discovery indicates insufficient evidentiary support.

[R. 1:4-8(a).]

Strict compliance with each procedural requirement of Rule 1:4-8 is "a prerequisite to recovery[,]" and failure to conform to the rule's procedural requirements will result in a denial of the request for an attorney's fees sanction. Franklin Sav. Account No. 2067, 389 N.J. Super. at 281. For example, a frivolous litigation motion must be filed "no later than [twenty] days following the entry of final judgment." R. 1:4-8(b)(2). Also, subsection (b)(1) of Rule 1:4-8 requires a party seeking frivolous litigation sanctions to "file a separate motion [for the sanction] describing the specific conduct alleged to be a violation of the Rule." Toll Bros., 190 N.J. at 69. Prior to filing such a motion, the litigant seeking the sanction must "serve a written notice and demand on the

attorney or pro se party, which must include a request that the allegedly frivolous paper [or pleading] be withdrawn." Ibid. This notice is generally referred to as a "safe harbor" notice. Ibid. The notice must "set [] forth 'with specificity' the basis for his or her belief that the pleading is frivolous. The notice must be sufficiently specific and detailed to provide an opportunity to 'withdraw the assertedly offending pleadings.'" Ferolito v. Park Hill Ass'n, 408 N.J. Super. 401, 408 (App. Div. 2009) (quoting Trocki Plastic Surgery Ctr. v. Bartkowski, 344 N.J. Super. 399, 406 (App. Div. 2001)). See R. 1:4-8(b)(1)(i)-(ii). As we have stated:

> In the context of a claim against a party who is represented, a proper notice and demand . . . serves the additional benefit of bringing the weakness of the claim to the attention of a client who is presumably acting on the advice of the attorney. In contrast, a notice and demand articulating an objection on one legal theory does not serve to alert the client or the attorney to other weaknesses. Consequently, a prevailing party's obligation to give proper notice as a condition of recovering an award of fees and costs is not fulfilled by a notice that alerts a party to the frivolous nature of a different claim. The purpose of the notice and demand is to inform, not distract and confuse.
>
> [Ferolito, 408 N.J. Super. at 409.]

Additionally, in order to ensure Rule 1:4-8 does not become another routine method for awarding attorney's fees, "the Rule imposes a temporal

limitation on any fee award, holding that reasonable fees may be awarded only from that point in the litigation at which it becomes clear that the action is frivolous." LoBiondo, 199 N.J. at 99 (citing DeBrango v. Summit Bancorp, 328 N.J. Super. 219, 229-30 (App. Div. 2000)); see also United Hearts, 407 N.J. Super. at 395 (reversing sanctions against an attorney where trial court allowed case to survive summary judgment and proceed to trial, thus precluding findings of frivolous pleading or bad-faith litigation).

Subsection (f) of Rule 1:4-8, titled "Applicability to Parties," provides that "[t]o the extent practicable, the procedures prescribed by this rule shall apply to the assertion of costs and fees against a party other than a pro se party pursuant to N.J.S.A. 2A:15-59.1." Thus, a litigant moving for counsel fees and costs pursuant to N.J.S.A. 2A:15-59.1 is required to comply with Rule 1:4-8(b)(1)'s safe harbor provision, but only "[t]o the extent practicable." R. 1:4-8(f).

By statute, a pleading is "frivolous" if:

> (1) The complaint, counterclaim, cross-claim or defense was commenced, used or continued in bad faith, solely for the purpose of harassment, delay or malicious injury; or

> (2) The non-prevailing party knew, or should have known, that the complaint, counterclaim, cross-claim or defense was without any reasonable basis in law or equity and could not be supported by a good faith

A-2342-17T3

argument for an extension, modification or reversal of existing law.

[N.J.S.A. 2A:15-59.1(b)(1)-(2).]

Just like Rule 1:4-8, the Frivolous Litigation Statute is interpreted restrictively. DeBrango, 328 N.J. Super. at 226. Sanctions should be awarded only in exceptional cases. Fagas v. Scott, 251 N.J. Super. 169, 181 (Law Div. 1991).

"'[T]he burden of proving that the non-prevailing party acted in bad faith' is on the party who seeks fees and costs pursuant to N.J.S.A. 2A:15-59.1." Ferolito, 408 N.J. Super. at 408 (alteration in original) (quoting McKeown-Brand v. Trump Castle Hotel & Casino, 132 N.J. 546, 559 (1993)). When a prevailing party's allegation is based on an assertion that the non-prevailing party's claim lacked "a reasonable basis in law or equity," and the non-prevailing party is represented by an attorney, "an award cannot be sustained if the '[non-prevailing party] did not act in bad faith in asserting' or pursuing the claim." Ibid. (quoting McKeown-Brand, 132 N.J. at 549). As we stated:

> The rationale for requiring proof of bad faith is that clients generally rely on their attorneys "to evaluate the basis in law or equity of a claim or defenses," and "a client who relies in good faith on the advice of counsel cannot be found to have known that his or her claim or defense was baseless."

[Ibid. (quoting McKeown-Brand, 132 N.J. at 557-58).]

"When the [non-prevailing party's] conduct bespeaks an honest attempt to press a perceived, though ill-founded and perhaps misguided, claim, he or she should not be found to have acted in bad faith." Belfer v. Merling, 322 N.J. Super. 124, 144-45 (App. Div. 1999). "Thus, a grant of a motion for summary judgment in favor of a [prevailing party], without more, does not support a finding that the [non-prevailing party] filed or pursued the claim in bad faith." Ferolito, 408 N.J. Super. at 408. Where the pleading party had an objectively reasonable and good faith belief in the merits of the claim, attorney's fees will not be awarded. First Atlantic, 391 N.J. Super. at 433.

Of course, litigation may become frivolous, and therefore sanctionable, by continued litigation over a meritless claim, even if the initial pleading was not frivolous or brought in bad faith. DeBrango, 328 N.J. Super. at 226. This is because the "requisite bad faith or knowledge of lack of well-groundedness may arise during the conduct of the litigation." United Hearts, 407 N.J. Super. at 390 (citation omitted).

Here, the trial court itself declared at the outset of its opinion of August 4, 2017 that "[t]his litigation arises out of circumstances that are sui generis." In its December 13, 2017, it further acknowledged Bove's contentions had "merit

in the abstract," and that discovery afforded Bove the chance to gather evidence based upon credible science and to engage a scientific expert. Nonetheless, the motion judge found Bove's complaint "was frivolous as defined in both [Rule] 1:4-8, and N.J.S.A. 1A:15-59.1, and that plaintiff's counsel [was] obligated under [the] Court Rules for payment of counsel fees to defendants." The trial court declined to award sanctions against Bove, finding he did not act in bad faith nor should he have known his complaint "was without a reasonable basis in law or equity." However, the trial court specifically determined Bove's complaint should have been withdrawn when he received defendants' "safe harbor" letter, or, alternatively, his counsel should have investigated whether his claims had merit. The trial judge stated:

> How plaintiff's counsel could proceed for another 19 months without retaining an expert bespeaks a lack of appreciation for the issues raised by the Complaint and defendants' "safe harbor" letter. Had plaintiff's counsel informed the [c]ourt that he wished an initial period to consult with a scientific expert, such time would have been granted. But no such request was made.
>
> That would have been the prudent course because [plaintiff's counsel] needed to determine whether he could prove: (a) that plaintiff did indeed suffer injury; (b) that plaintiff's injuries were directly linked to his exposure to NasoCell[ ]; and (c) that [Kligerman] knew with "substantial certainty" that [plaintiff] would be injured. In lieu of focusing on a coherent explanation of how NasoCell[ ] caused plaintiff's alleged injuries,

this litigation continued for more than [two] years; resulted in significant expense to the parties; and plaintiff never produced a single piece of evidence to support his contention that he was injured, that defendants were the cause of the injury, or that defendants committed an intentional wrong, thereby vaulting the WCA litigation bar. Equally puzzling to the [c]ourt is the history of the plaintiff's WCA claim which has been pending for more than four years, wherein plaintiff has repeatedly cancelled [independent medical examinations] scheduled by defendants and has yet to proffer proofs in support of the WCA Petition.

The motion judge also pointed out that prior to the evidentiary hearing, he warned Bove's counsel that he would "not hesitate to award counsel fees when a proper Rule 1:4-8 letter had been served, and a claim is found to be meritless." We note, however, that defendants' Rule 1:4-8 "safe harbor" letter did not raise the issue that Bove lost on following the evidentiary hearing—the WCA exclusive remedy bar. Notwithstanding the defendants' failure to mention the WCA exclusivity bar in its "safe harbor" letter, the trial court found Bove's attorneys continued to pursue Bove's claims, even though no "credible, tangible" evidence was presented to show defendants knew, with substantial certainty, Bove would be injured from his use of NasoCell and Bove, in fact, was injured by defendants' actions.

A-2342-17T3

The trial court then analyzed defense counsel's affidavit of services and calculated a "lodestar figure," for what he deemed a reasonable fee, consistent with Rendine v. Pantzer, 141 N.J. 292 (1995). See also R. 1:4-8(b)(2) and R. 4:42-9(b) and (c) (allowing for an award based on reasonable expenses and fees as detailed in an affidavit of services). Rather than simply accepting the figure presented by defendants, the trial court carefully scrutinized defense counsel's billing entries, the hourly rate of defendants' lead counsel, and defendants' request for reimbursement of expenses, including expert witness fees, before adjusting the amount of the award to a figure it deemed reasonable.

Notwithstanding the trial court's painstaking analysis, we find it erred by awarding sanctions against Bove's counsel, without accounting for the temporal limitation governing such an award. Certainly, when the court issued its order of April 19, 2016, initially denying defendants' motion for summary judgment, the date of that order provided a "cut-off" date and sanctions should not have been awarded for litigation fees and expenses incurred prior to that date. This is particularly true where, after summary judgment was denied and discovery orders entered, Bove's counsel was allowed to retain an expert in March 2017, and to proceed to an evidentiary hearing. Bove's counsel might have been hard-pressed to surmise Bove's complaint was frivolous in light of this procedural

and factual history. At any rate, because summary judgment was denied on all but one of Bove's causes of action on April 19, 2016, we see no basis to conclude Bove's attorneys violated the frivolous litigation rule as early as May 5, 2015 or that they continued to pursue litigation frivolously in the months leading up to the initial summary judgment ruling. Although some of the allegations made at the outset of the litigation later proved to be unfounded, this outcome does not render Bove's complaint frivolous. McDaniel, 419 N.J. Super. at 499. Nor does the grant of summary judgment at the conclusion of the hearing, without more, merit the imposition of sanctions. Ferolito, 408 N.J. Super. at 408.

Even if Bove's attorneys had litigated this unique matter in bad faith after the initial summary judgment ruling in 2016, that distinction should have been made and fees apportioned accordingly. LoBiondo, 199 N.J. 62 at 99. As we find no indication that the trial court "backed out" fees or expenses prior to the date of its summary judgment ruling in 2016, the award cannot stand.

It next bears repeating that the May 5, 2015 "safe harbor" letter made no mention of the WCA's exclusivity bar, even though that bar was the basis on which defendants prevailed. This lack of specificity constituted a failure to properly alert Bove and his counsel to the alleged frivolous nature of Bove's claim. Contrary to the position taken by defendants on appeal, even if a non-

prevailing party does not complain about a deficiency regarding a safe-harbor notice, the judiciary itself has an institutional interest in assuring that the safe-harbor prerequisite to fee-shifting is strictly enforced. See Toll Brothers, 190 N.J. at 71 (noting that the safe-harbor mechanism helps preserve, among other things, judicial resources). See also Trocki Plastic Surgery Ctr., 344 N.J. Super. at 406 (holding that a plaintiff's failure to give "specific and detailed notice" of the withdrawal provisions required rejection of the plaintiff's motion for fees under N.J.S.A. 2A:15-59.1). The deficiency in defendants' "safe harbor" letter, whereby it failed to specifically detail that Bove's claims were governed by the WCA's exclusivity bar, provides an additional reason for reversing the trial court's award of sanctions.

Lastly, we note that at no point in the trial court's December 13, 2017 opinion did it state Bove's attorneys acted in bad faith, even if it did find some of their actions were "egregious." As we have indicated previously, a pleading will not be considered frivolous for the purpose of imposing sanctions under Rule 1:4-8 unless the pleading as a whole is frivolous. Moreover, sanctions are not warranted if an attorney has a reasonable and good faith belief in the claims being asserted. Without a finding Bove's attorneys acted in bad faith and with no explanation as to why the trial court found the significant sum of $205,147.82

was the amount needed to deter them from similar conduct, <u>Rule</u> 1:4-8(d), the sanction is unsupportable. Accordingly, we reverse the order entering judgments against plaintiff's counsel.

The remaining arguments raised by plaintiff's counsel do not warrant discussion in this opinion. <u>R.</u> 2:11-3(e)(1)(E).

Affirmed in part and reversed in part.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION