**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1893-22

TONYELLE R. JAMISON, as
administratrix ad prosequendum
of the ESTATE OF RUBY NELL
KING,

      Plaintiff-Appellant,

v.

JERSEY CITY MEDICAL
CENTER, KEVIN DIMARCO,[1]
and ARMANDO VALLES,[2]

      Defendants-Respondents,

and

NATIA MOLINEROS,

      Defendant.

_____

Argued September 12, 2024 – Decided October 1, 2024

Before Judges Mawla, Natali, and Vinci.

_____

[1] Improperly pled as Kevin Demarco.

[2] Improperly pled as Armando Vailes.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Docket No. L-1210-20.

Richard A. Grodeck argued the cause for appellant (Piro, Zinna, Cifelli, Paris & Genitempo, LLC, attorneys; Richard A. Grodeck, on the briefs).

Douglas F. Ciolek argued the cause for respondents (Rosenberg, Jacobs, Heller & Fleming, PC, attorneys; Gayle M. Halevy, on the brief).

PER CURIAM

Plaintiff Tonyelle R. Jamison, as administratrix ad prosequendum of the Estate of Ruby Nell King, appeals from the Law Division's February 17, 2023 order granting summary judgment in favor of defendants Jersey City Medical Center (JCMC), Kevin DiMarco, and Armando Valles.[3] We affirm.

I.

Shortly after 2:00 p.m. on March 30, 2018, sixty-one-year-old Ruby Nell King collapsed while visiting friends and family in Jersey City. At 2:04 p.m., a friend who was with King called 9-1-1 and reached a Hudson County Emergency Network dispatcher. At 2:05 p.m., a JCMC basic life support (BLS)[4] unit

_____

[3] Defendant Natia Molineros was previously dismissed voluntarily and is not a party to this appeal.

[4] BLS "means a basic level of pre-hospital care which includes patient stabilization, airway clearance, cardiopulmonary resuscitation, hemorrhage

operated by two emergency medical technicians (EMT)[5] was dispatched and was enroute at 2:06 p.m.

At 2:06 p.m., JCMC supervisor Melissa Isidro was dispatched in a quick response vehicle (QRV) to "[a]ssist [o]nly."  According to Isidro, the QRV is a pick-up truck that carries only BLS equipment and is "used to respond to priority calls in order to get aid to incidents where . . . the [QRV] might get there faster or there is[not] another unit available."  The QRV is an "extra" vehicle operated by a single paramedic or EMT that "roams wherever it wants during a shift" and responds to emergency calls at the discretion of the supervisor.  The QRV does not carry advanced life support (ALS)[6] equipment, including intubation equipment or medication.

_____

control, initial wound care and fracture stabilization and other [authorized] techniques and procedures . . . ."  N.J.S.A. 26:2K-21(b).

[5] For purposes of this opinion, an EMT is a person trained in BLS care and is permitted only to administer BLS care.

[6] ALS "means an advanced level of pre-hospital . . . and emergency service care which includes [BLS] functions, cardiac monitoring, cardiac defibrillation, telemetered electrocardiography, administration of anti-arrhythmic agents, intravenous therapy, administration of specific medications, drugs and solutions, use of adjunctive ventilation devices, trauma care and other [authorized] techniques and procedures."  N.J.S.A. 26:2K-7(a) (Mar. 2018).  The Legislature amended the definition of ALS services in 2022, see L. 2022, c. 118 (Oct. 2022). We consider the definition in effect at the time of the incident.

A-1893-22

Although Isidro is a mobile intensive care paramedic trained in ALS services, when she was operating the QRV on March 30, 2018, she was working without a paramedic partner, in the capacity of a supervisor designated as a BLS first responder, not a paramedic.[7] According to Isidro, because she was not accompanied by a second paramedic, she was not permitted to provide ALS services.

At 2:08 p.m., after the dispatcher obtained information necessary to determine ALS services were needed, ALS unit 454 was dispatched. At 2:09 p.m., Isidro arrived on scene in the QRV. King was unresponsive with no pupil reaction, breathing, or pulse. Isidro began cardiopulmonary resuscitation (CPR) and attached an automated external defibrillator (AED) to the patient. The AED identified a "shockable rhythm," either ventricular fibrillation or ventricular tachycardia, and indicated defibrillation was appropriate. Isidro continued CPR and administered two shocks using the AED. At 2:13 p.m., the BLS unit arrived and the EMTs continued CPR and began administering oxygen using bag-vale-mask (BVM) ventilation.

---

[7] A mobile intensive care paramedic or EMT-paramedic is a person trained in ALS and licensed by the Commissioner of the Department of Health to render ALS services. N.J.S.A. 26:2K-7(h) and N.J.A.C. 8:41-1.3.

At 2:14 p.m., ALS unit 454 advised the dispatcher it was "[d]elayed by [t]raffic." At 2:17 p.m., ALS unit 452 was dispatched and enroute less than one minute later. Unit 452 arrived on scene at 2:21 p.m., operated by mobile intensive care paramedics DiMarco and Valles, and paramedic student Molineros.[8] Unit 452 carried ALS equipment including advanced airway equipment, intubation equipment, and medication. At 2:23 p.m., King had no pulse or measurable blood pressure and was in a condition known as pulseless electrical activity. Valles administered two doses of epinephrine at 2:24 p.m. and 2:27 p.m., and the crew continued chest compressions and BVM ventilation. By 2:29 p.m., King's pulse was restored, her cardiac rhythm was improving, and she had a return of spontaneous circulation.

At 2:30 p.m., Molineros attempted to intubate King, but she was not successful. The crew continued BVM ventilation and at 2:34 p.m. King's oxygen saturation was stabilizing even though she had not yet been successfully intubated. At 2:35, DiMarco successfully intubated King and she was transported to JCMC. On April 22, 2018, King died from anoxic brain injury caused by her cardiac arrest.

---

[8] Molineros was certified as an EMT and was in the last four months of her two-year paramedic training, having already completed classroom and clinical training in intubation.

A-1893-22

Plaintiff filed her complaint in this action alleging defendants "were negligent in the provision of emergent care and proper life saving protocols were not performed and [King] was denied oxygen for a prolonged period of time." Plaintiff served expert reports authored by Paul Werfel, director of the EMT and paramedic programs at Stony Brook University, and Dr. Kevin Brown, a board-certified emergency medicine physician.

Werfel opined that the cardiac rhythm identified by Isidro upon her arrival, Torsade de Pointes (TdP), "is a treatable rhythm for paramedics" and had Isidro "had the basic paramedic equipment and medications on [the QRV], . . . King's condition would have been initially treatable and reversible."[9] According to Werfel, the "failure of JCMC to provide Isidro with ALS equipment meant that her arrival within eight minutes was meaningless." "She was unable to render 'definitive care' without medication, i.e., [m]agnesium (for the treatment of [TdP]), epinephrine, and without intubation equipment."[10]

---

[9] Isidro contends she did not have any way of identifying the rhythm as TdP and the entry was made electronically in error. That dispute, however, is not material to our analysis of the claims before us. We will assume, as plaintiff contends, the rhythm when Isidro arrived was TdP.

[10] Werfel also opined that dispatching the first ALS unit at 2:17 p.m. was a departure from the standard of care. At his deposition, he conceded he was not aware the first ALS unit was dispatched at 2:08 p.m. and retracted that portion of his report.

A-1893-22

At his deposition, Werfel testified DiMarco and Valles did not do or fail to do anything he believed to be a deviation from the applicable standard of care. Werfel also testified JCMC satisfied the applicable standard of care by dispatching BLS and ALS units, and JCMC was not also required to dispatch a supervisor in the QRV. In Werfel's opinion, dispatching the QRV was "extra" and was not required.

Dr. Brown opined that JCMC was "chronically understaffed by paramedics and EMTs" and "[t]his understaffing leads to delayed emergency responses by paramedics to 9-1-1 emergency calls." According to Dr. Brown, "[t]he paramedic unit that arrived at . . . King's home took an excessive amount of time to arrive. As a result, . . . King was deprived of life-saving ALS treatment." He concluded, "[l]ikely, the number of ALS units staffed with [p]aramedics on the day of . . . King's cardiac arrest was less than scheduled." Dr. Brown opined, "[h]ad the ALS staffing been at required staffing levels on that date in 2018, the medic unit would have arrived earlier . . . ."

At his deposition, Dr. Brown conceded he did not know how many ALS units were scheduled to be in service on March 30, 2018, how many ALS units were in service, where those units were located at the time of King's cardiac arrest, or if additional ALS units would have resulted in a faster response time

7

in this case. He also conceded he did not have an opinion as to the minimum number of ALS units JCMC should have had in service at that time to meet the standard of care. Instead, he testified he would need to "defer to [Isidro] and say you need the number to respond to a priority one assignment to have a BLS unit there within . . . five minutes and an ALS unit there within . . . nine minute[s] . . . ." Dr. Brown, however, opined "all indications are that they were short one unit compared to their ideal staffing" and "[m]ore likely than not there was one less unit than they were staffed for."

Dr. Brown's opinions were based solely on the deposition testimony of Isidro who testified that on "most days" there were three JCMC ALS units available, one of which was not in located in Jersey City. However, Isidro testified "some days there[ were] four." She continued:

> Q: On what days are there four?
>
> A: It depends on staffing.
>
> Q: How many paramedics . . . were employed by [JCMC] in March of 2018?
>
> A: I don't know.
>
>      . . . .
>
> Q: You said on most days there were two ALS units, but it could be as many as four. I take it sometimes there w[ere] three?

A:  Yes, sir.

Q:  Is there any way of determining how many ALS units were in use on March 30, 2018 at [2:04 p.m.]?

A:  Not at this time.

Isidro testified that JCMC switched scheduling programs in 2019 and, as a result, she did not have access to staffing information for 2018.  She was not aware if any effort was made to obtain staffing information from the prior system.[11]

According to Isidro, the ALS units operated in three zones and "mostly" there was one ALS unit assigned to each zone.  Specifically, she testified:

Q:  Back in March of 2018, was only one ALS unit assigned to roam each zone?

A:  Mostly, sir.

Q:  You say mostly, so I take it sometimes more than one ALS unit would roam each zone; is that right?

A:  Yes, sir.

Q:  Under what circumstances would more than one unit roam a zone?

---

[11]  Notably, Isidro did not testify the information was lost or destroyed, only that it was not available to her on the system implemented in 2019.

A: On the very rare occasion that all the paramedic units were available and there were[ not] enough zones for ALS units.

Q: What do you mean by very rare occasion?

A: Due to staffing, it[is] very rare that there would be an occasion that all the ALS units would be staffed.

Q: Were there difficulties with staffing in March of 2018?

A: Yes.

Q: You were short manpower?

A: Yes. . . .

Q: Short both EMT and paramedics . . . ?

A: Short everywhere, sir.

Q: When you say everywhere, you mean among EMTs and paramedics?

A: ALS, BLS, dispatchers, supervisors. We were short staffed.

Q: How long had you been short staffed?

A: As long as I can remember, sir.

. . . .

Q: Do you know whether there was any internal review about dealing with or correcting the staff shortages?

A:  Management was working very hard around
the clock for it, sir.

Dr. Brown also opined "[t]here was a delay in intubating . . . King as the paramedics allowed a paramedic student, . . . Molineros, to attempt" to intubate the patient.  According to Dr. Brown, King "was not in a stable condition[,] and the paramedic should not have allowed the student to attempt intubation."  At his deposition, Dr. Brown testified paramedic students are permitted to intubate patients in the field and conceded he did not know how many intubations Molineros performed before March 30, 2018.  However, he testified allowing Molineros to intubate King "was horrible, horrible judgment," and "reckless and dangerous."  Dr. Brown testified he did not know why Molineros was unable to intubate King and he did not "see that she deviated from what a student would do."

Finally, Dr. Brown opined that the "reader" on the AED Isidro used was broken and that limited the information available about King's initial condition because Isidro was not able to download a report of the incident from the AED into her patient care report.  At his deposition, Dr. Brown testified the AED otherwise functioned properly, King's care was not impacted by the broken AED reader, and the broken AED reader did not cause King injury.

11

After the close of discovery, defendants moved for summary judgment. After briefing was completed, the court granted plaintiff leave to file an amended complaint. In the amended complaint, plaintiff alleged "[a]s a result of chronic issues with paramedic understaffing [Isidro] did not have a partner on March 30, 2018, and as a result was assigned to a [QRV]" and JCMC "was negligent in that it failed to properly equip the [QRV]." Plaintiff also alleged DiMarco and Valles "were negligent in the provision of emergent care and proper life saving protocols were not performed and [King] was denied oxygen for a prolonged period of time."

On February 17, 2023, the court heard oral argument and granted defendants' motion in an oral opinion. The court first determined DiMarco and Valles were entitled to immunity pursuant to N.J.S.A. 26:2K-14 because there was no evidence they failed to render ALS in good faith by permitting Molineros to intubate King. The court also found JCMC was entitled to immunity for claims arising out of the conduct of DiMarco and Valles because "allowing a paramedic student to perform an intubation . . . is permitted by N.J.A.C. 8:41-12.1(c)(7)" and doing so "does not negate the good-faith effort in rendering" ALS.

A-1893-22

The court rejected plaintiff's claim that failing to equip the QRV with ALS supplies was a deviation from the applicable standard of care because dispatching "a single BLS and a single ALS unit on the scene would have met the standard of care." Because "the BLS unit and ALS unit were dispatched along with [Isidro's] unit and dispatching [Isidro's] unit did not affect the arrival of the other units, [Isidro's] attendance was not required at the scene."

The court rejected plaintiff's claim that chronic understaffing led to a delayed response finding the "record shows that there were two ALS units that were dispatched . . . and one of those units arrived and provided at the scene care." It concluded, "[d]espite Dr. Brown's opinion [] [that] the undertaff[ing] delay[ed] [King's] care, Dr. Brown nor plaintiff explained how it compared to the location of the two ALS units, more ALS units, another location would have led to [an earlier] arrival time that day."

The court also rejected plaintiff's claims regarding the AED reader because Dr. Brown conceded the reader was "not necessary to administer care." Ultimately, it found, "the care provide[d to King] was performed in good faith and neither plaintiff's argument nor [her] experts explain how the systemic flaws they have highlighted directly caused delay [in] care to [King] on March 30[], 2018."

13

On appeal, plaintiff argues the court erred in granting summary judgment because: (1) JCMC is not entitled to immunity under N.J.S.A. 26:2K-14 for injury caused by the alleged "structural and systemic flaws" in its "emergency system"; (2) the court failed to recognize that JCMC's structural flaws were a proximate cause of King's death; and (3) the decision to permit a student to attempt intubation and then wait five minutes to successfully intubate King after Molineros's failed effort was not made in good faith.

II.

We affirm substantially for the reasons set forth in the court's oral opinion. We add the following comments.

We review a grant of summary judgment de novo, Branch v. Cream-O-Land Dairy, 244 N.J. 567, 582 (2021), "under the same standard that govern[ed] the court's determination." Goldhagen v. Pasmowitz, 247 N.J. 580, 593 (2021). We "must 'consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party.'" Meade v. Twp. of Livingston, 249 N.J. 310, 327 (2021) (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995)).

"Summary judgment should be granted . . . 'against a party who fails to

A-1893-22

make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Friedman v. Martinez, 242 N.J. 449, 472 (2020) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). "[C]onclusory and self-serving assertions . . . are insufficient to overcome the motion." Puder v. Buechel, 183 N.J. 428, 440-41 (2005). "Competent opposition requires 'competent evidential material' beyond mere 'speculation' and 'fanciful arguments.'" Hoffman v. Asseenontv.com, Inc., 404 N.J. Super. 415, 426 (App. Div. 2009) (quoting Merchs. Express Money Ord. Co. v. Sun Nat'l Bank, 374 N.J. Super. 556, 563 (App. Div. 2005)).

A.

We are satisfied the court correctly determined defendants are entitled to immunity pursuant to N.J.S.A. 26:2K-14, which provides, in relevant part:

> No mobile intensive care paramedic, . . . hospital . . . first aid, ambulance or rescue squad, . . . shall be liable for any civil damages as the result of an act or the omission of an act committed while in training for or in the rendering of . . . advanced life support services in good faith and in accordance with this act.

There is no dispute JCMC's employees are paramedics protected by N.J.S.A. 26:2K-14, nor is there any dispute intubation and the administration of

A-1893-22

medications such as magnesium are ALS services. Plaintiff, however, argues her claims against JCMC do not fall within the immunity granted by the statute because the claims are premised on allegations of "systemic and structural flaws," rather than the rendering of ALS services. We are not convinced.

Plaintiff contends the direct causes of King's injuries were the delay in successfully intubating her and the failure to administer magnesium when Isidro arrived in the QRV. These claims fall squarely within the immunity afforded by N.J.S.A. 26:2K-14 because they are based on acts or omissions committed in the rendering of ALS services.

Plaintiff's reliance on De Tarquino v. City of Jersey City, 352 N.J. Super. 450 (App. Div. 2002), is not persuasive. In De Tarquino, a patient who had been treated by EMTs and transported to a hospital died of a hematoma after being discharged from the emergency room. Id. at 453.[12] The plaintiff alleged the ambulance service was negligent for failing to note in the report the EMTs provided to the hospital that the patient had vomited while being treated. Id. at 452. We noted plaintiff's claim was "not predicated on alleged negligence in the 'direct rendering' of [EMT] services but rather in failing to note in the report

---

[12] De Tarquino involved emergency care rendered by EMTs and implicated N.J.S.A. 26:2K-29 "which provides an immunity that is virtually identical to" N.J.S.A. 26:2K-14. Id. at 455.

provided to [the hospital] that decedent had been vomiting." Id. at 455. We determined the immunity afforded to EMTs does not extend to "the preparation of a report regarding [EMT] services and the patient's condition." Id. at 457.

Here, unlike De Tarquino, plaintiff's claims are based on injury allegedly caused by acts or omissions in the rendering of ALS services. The alleged "systemic and structural flaws" plaintiff identifies could not have resulted in injury to King absent acts or omissions committed in the rendering of ALS services. Therefore, we conclude the court determined correctly JCMC is entitled to immunity pursuant to N.J.S.A. 26:2K-14.

### B.

Plaintiff next contends the question of whether DiMarco and Valles rendered ALS services in good faith presents a question of fact that could not be decided on summary judgment. Specifically, plaintiff contends, given King's unstable condition, it was not appropriate to permit Molineros to attempt the intubation, and DiMarco took too long to intubate King after the initial unsuccessful attempt. We are not persuaded.

Generally, "'good faith'" has been defined as "'honesty of purpose and integrity of conduct without knowledge, either actual or sufficient to demand inquiry, that the conduct is wrong.'" Frields v. St. Joseph's Hosp., 305 N.J.

17

Super. 244, 248 (App. Div. 1997) (quoting Marley v. Borough of Palmyra, 193 N.J. Super. 271, 294 (Law Div. 1983)). While the issue of good faith is often determined in a plenary hearing, summary judgment is proper where the defendant demonstrates that the actions "were objectively reasonable or that they performed them with subjective good faith." Canico v. Hurtado, 144 N.J. 361, 365 (1996). "This test recognizes that even a person who acted negligently is entitled to a qualified immunity, if [the person] acted in an objectively reasonable manner." Frields, 305 N.J. Super. at 248 (citing Canico, 144 N.J. at 366).

In Frields, the plaintiff claimed paramedics used excessive force when putting his son on an ambulance, which caused a brain hemorrhage that resulted in his death. Ibid. The plaintiff argued the paramedics should have administered a chemical sedative rather than use physical restraint. Ibid. We held that, while the plaintiff proffered evidence of a possible negligence claim against the paramedics, he failed to present any evidence that created a genuine issue of fact that they did not act in an objectively reasonable manner. Id. at 249. Because the paramedics acted in good faith, they were entitled to immunity under N.J.S.A. 26:2K-14. Ibid.

Here, plaintiff's claim is based solely on Dr. Brown's opinion that it was "horrible" judgment and "reckless and dangerous" for DiMarco and Valles to permit Molineros to attempt the intubation. Dr. Brown, however, conceded at his deposition Molineros was, as a paramedic student, expressly permitted pursuant to N.J.A.C. 8:41-12.1(c)(7), to intubate patients in the field. In addition, Dr. Brown did not know how many times Molineros intubated patients before March 30, 2018. Dr. Brown testified he did not know why her intubation attempt failed and did not believe Molineros "deviated from what a student would do."

Plaintiff's claim that DiMarco took too long to intubate King after the initial unsuccessful attempt is not supported by any expert opinion. In fact, Werfel opined DiMarco did not deviate from any applicable standard of care. In his report, Dr. Brown does not offer any opinion on this alleged delay. His opinion is limited to the decision to permit Molineros to attempt the intubation, not the alleged delay after the unsuccessful attempt.

According to DiMarco, "there were many little things that need[ed] to get done" before he could attempt the intubation again. These included troubleshooting the problem with the initial intubation, positioning himself with the proper equipment, possibly readjusting the patient's position, and confirming

19

that the intubation tube was clean, which sometimes requires using a new intubation tube. He also testified it was necessary to continue the BVM ventilation between attempts.

At best, plaintiff sets forth a viable claim of negligence. Plaintiff does not offer any evidence to support a finding that DiMarco and Valles did not act in good faith. We are satisfied, based on the facts and circumstances of this case, the court correctly determined DiMarco and Valles demonstrated their actions "were objectively reasonable or that they performed them with subjective good faith." Canico, 144 N.J. at 365. Summary judgment, therefore, was properly granted on the issue of good faith.

## C.

Even if defendants were not entitled to immunity, the court correctly determined plaintiff failed to establish JCMC breached any applicable standard of care and failed to prove the alleged "systemic and structural flaws" caused King's injuries.

A cause of action for negligence "requires the establishment of four elements: (1) a duty of care; (2) a breach of that duty; (3) actual and proximate causation; and (4) damages." Jersey Cent. Power & Light Co. v. Melcar Util. Co., 212 N.J. 576, 594 (2013). The plaintiff "bears the burden of establishing

those elements 'by some competent proof.'" Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 406 (2014) (citations omitted) (first citing Buckelew v. Grossbard, 87 N.J. 512, 525 (1981), then quoting Overby v. Union Laundry Co., 28 N.J. Super. 100, 104 (App. Div. 1953)).

Plaintiff relies on the expert reports of Werfel and Dr. Brown in support of her claims. Expert opinions, however, must "be grounded in 'facts or data derived from[:] (1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence but which is the type of data normally relied upon by experts.'" Townsend v. Pierre, 221 N.J. 36, 53 (2015) (quoting Polzo v. Cty. of Essex, 196 N.J. 569, 583 (2008)). "The net opinion rule is a 'corollary of [N.J.R.E. 703] . . . which forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data.'" Id. at 53-54 (alteration in original) (quoting Polzo, 196 N.J. at 583).

Therefore, an expert is required to "'give the why and wherefore' that supports the opinion, 'rather than a mere conclusion.'" Id. at 54 (quoting Borough of Saddle River v. 66 E. Allendale, L.L.C., 216 N.J. 115, 144 (2013)). The net opinion rule directs that experts "be able to identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the

factual bases and the methodology are reliable." Id. at 55 (quoting Landrigan v. Celotex Corp., 127 N.J. 404, 417 (1992)).  In short, the net opinion rule is "a prohibition against speculative testimony." Harte v. Hand, 433 N.J. Super. 457, 465 (App. Div. 2013) (quoting Grzanka v. Pfeifer, 301 N.J. Super. 563, 580 (App. Div. 1997)).

Dr. Brown's claims that "[l]ikely, the number of ALS units staffed with [p]aramedics . . . was less than scheduled" and "[h]ad the ALS staffing been at required staffing levels . . . the medic unit would have arrived earlier" are speculative and impermissible net opinions.  Dr. Brown offered these opinions without knowing how many ALS units were staffed and available on March 30, 2018, how many were scheduled to be available, or how many were necessary to meet the applicable standard of care.

Dr. Brown speculated that because Isidro did not have a paramedic partner, there likely were only two ALS units available.  Isidro testified, however, she did not know how many ALS units were available on March 30 and there could have been as many as four available.  Without knowing how many ALS units were available, how many were scheduled to be available, or how many JCMC needed in service, Dr. Brown did not have an adequate factual basis for his opinion that there were an insufficient number of ALS units

A-1893-22

available. The court correctly found plaintiff failed to establish JCMC breached the applicable standard of care.

Dr. Brown's opinion that an additional ALS unit would have resulted in a faster response in this case likewise is based on nothing more than speculation. He did not provide any factual basis for this opinion, other than to baldly assert that additional ALS units would have resulted in a quicker response. An expert needs to do more than make conclusory assertions without any factual basis. We are satisfied the court correctly determined plaintiff failed to prove the alleged understaffing at JCMC caused King's injuries.

Finally, the court properly rejected plaintiff's claim, based on Werfel's expert report, that JCMC breached its duty of care by not equipping the QRV with ALS supplies. At his deposition, Werfel conceded JCMC satisfied the applicable standard of care by timely dispatching both a BLS unit and an ALS unit. He agreed the QRV was an "extra" unit and JCMC was not obligated to dispatch the QRV. We are satisfied based on the facts and circumstances of this case the court correctly concluded JCMC did not breach any duty owed to King by allegedly failing to equip the QRV with ALS supplies.

Moreover, Isidro testified that in 2018, a single paramedic without a paramedic partner was not permitted to render ALS services. Therefore, even if

23

the QRV carried ALS equipment, she would not have been permitted to render ALS services until the ALS unit arrived. Without citation to any authority, plaintiff contends Isidro was incorrect.

Our review of applicable authority has not revealed any basis to conclude Isidro's understanding of the applicable statutes and regulation in effect in 2018 was incorrect. In fact, effective October 21, 2022, the Legislature amended N.J.S.A. 26:2K-10 to provide a single "mobile intensive care paramedic shall be permitted to provide [ALS] services when operating outside of a mobile intensive care unit in situations directly related to EMS first response . . . ." As Isidro correctly testified, prior to the 2022 amendment, a single paramedic operating a unit such as a QRV was not permitted to render ALS services. Because Isidro would not have been permitted to render ALS services even if the QRV was so equipped, plaintiff failed to establish the requisite causative link.

To the extent we have not addressed any of plaintiff's remaining arguments, including plaintiff's argument relating to the AED reader, it is because they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1893-22