**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2975-23

608-610 MULLICA HILL
ROAD, LLC and MJS
ENTERPRISES, INC.,

     Plaintiffs-Appellants/Cross-
     Respondents,

v.

CUMBERLAND COUNTY
IMPROVEMENT AUTHORITY,
a public body corporate and politic
of the State of New Jersey,

     Defendant-Respondent,

and

FRALINGER ENGINEERING PA,

     Defendant-Respondent/Cross-
     Appellant,

and

MARATHON ENGINEERING and
ENVIRONMENTAL SERVICES, INC.,
ENTERPRISE NETWORK
RESOLUTIONS CONTRACTING,

LLC, FABBRI BUILDERS,
INC., and COMMUNITY
HEALTH CARE, INC. d/b/a
COMPLETE CARE HEALTH
NETWORK, INC.,

      Defendants.

_____

      Argued May 13, 2025 – Decided July 25, 2025

      Before Judges Susswein, Perez Friscia, and Bergman.

      On appeal from the Superior Court of New Jersey, Law Division, Cumberland County, Docket No. L-0624-21.

      John J. Reilly argued the cause for appellants/cross-respondents 608-610 Mullica Hill Road, LLC and MSJ Enterprises, Inc. (Bathgate, Wegener & Wolf, PC, attorneys; John J. Reilly and Peter H. Wegener, of counsel and on the briefs; Daniel J. Carbone, on the briefs).

      John A. Carleton argued the cause for respondent Cumberland County Improvement Authority (Marmero Law, LLC, attorneys; Albert K. Marmero, on the brief).

      Joseph M. Tomaino argued the cause for respondent/cross-appellant Fralinger Engineering, PA (Landman Corsi Ballaine & Ford PC, attorneys; Joseph M. Tomaino, of counsel and on the briefs; Rachel M. Morgan, on the briefs).

PER CURIAM

A-2975-23

This case involves a civil action for trespass and a closely-related claim of a Fifth Amendment "taking" of private property by the government without just compensation.[1] Plaintiffs 608-610 Mullica Hill Road, LLC (Mullica) and MJS Enterprises, Inc. appeal from the following Law Division orders: a December 5, 2023 order granting defendant Fralinger Engineering, P.A. (Fralinger) frivolous litigation sanctions and fees against plaintiffs; a March 6, 2024 order denying plaintiffs' motion for summary judgment; a March 6, 2024 order granting defendant Cumberland County Improvement Authority's (CCIA) motion for summary judgment with prejudice and dismissing plaintiffs' claims and cross-claims; and a May 10, 2024 order denying plaintiffs' motion for reconsideration of the order denying them summary judgment and granting defendant summary judgment. Fralinger cross-appeals from the trial court's reduced award of frivolous litigation fees.

After reviewing the record in light of the parties' arguments and the governing legal principles, we conclude on de novo review that material factual issues of facts preclude disputes which preclude summary judgment of plaintiffs'

---

[1] The Taking Clause of the Fifth Amendment of the United States Constitution provides, "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V.

trespass/inverse condemnation claims. We therefore reverse the grant of summary judgment against plaintiffs[2] and remand for further proceedings.

With respect to the negligence action brought against Fralinger,[3] we affirm the trial court's substantive ruling on Fralinger's frivolous litigation claim. Further, we see no abuse of discretion in the trial court's determination to reduce the amount of fees sought by Fralinger. However, it is not clear how the trial court calculated the amount of that reduction. We therefore remand for the limited purpose of having the trial court make more detailed findings with respect to the amount of the frivolous litigation fee award and, if appropriate, adjust the final figure accordingly.

---

[2] Because we conclude there are material factual disputes, we affirm the trial court's order denying plaintiff's motion for partial summary judgment.

[3] We note that plaintiffs' negligence claims against Fralinger are analytically separate and distinct from the physical trespass/taking claims against CCIA and Marathon.

A-2975-23

## I.

We discern the following pertinent facts[4] from the record. The Property at issue measures approximately one-half acre and sits at the corner of North Laurel Street and Church Lane in Bridgeton. Mullica purchased the Property on December 31, 2012. Salim Joarder is the sole member of Mullica and the sole shareholder of MSJ Enterprises. At the time Mullica purchased the Property, it was already improved with a pizza carry-out and delivery shop. MSJ Enterprises subsequently purchased the shop and has been a tenant of the Property since April 1, 2019.

Prior to the remediation/construction activities that precipitated this dispute, vehicles entered the Property via Church Lane. According to Joarder, customers parked curbside at the front entrance on Church Lane. There were also six parking spaces in the rear of the shop next to the shop's trash area.

---

[4] Because this matter comes to us as an appeal from pretrial orders granting and denying motions for summary judgment, we note that the following facts are assertions and claims made by the parties and their representatives and agents as documented in certifications, attorney submissions, and discovery materials. We offer no opinion on the veracity of any of the disputed claims and assertions. We add that because we review summary judgment decisions de novo to determine whether there are material facts in dispute, see DeSimone v. Springpoint Senior Living, Inc., 256 N.J. 172, 180 (2024), we have chosen in this case to recount the facts asserted by the respective parties in considerable detail.

A-2975-23

The Bridgeton City Council (City Council) adopted Resolution 39-00, designating certain lots—including the Property—as requiring redevelopment (the Redevelopment Area). The City Council enacted Ordinance 17-27, which adopted a Redevelopment Plan for a portion of the Redevelopment Area, including the Property.

CCIA serves as Cumberland County's "economic and redevelopment entity" and has eminent domain power. According to Gerald Velazquez, CCIA's president and CEO, CCIA began working on the Redevelopment Area in 2013, prior to the adoption of the Development Project at issue in this litigation. Velazquez explained that the plans to develop the Redevelopment Area changed over time, and the final version of the Development Project was not adopted until 2018.

On June 27, 2013, CCIA sent a letter to Joarder in his capacity as the proprietor of the shop located on the Property. CCIA expressed interest in acquiring the Property for a project involving the Redevelopment Area. The letter advised Joarder that if CCIA acquired the property, he might be eligible for relocation assistance as a displaced business.

On July 19, 2013, CCIA sent a letter to Mullica, indicating that the Property may be subject to eminent domain and offering it an appraisal of the

A-2975-23

Property.[5]   However, CCIA never initiated condemnation proceedings against the Property.

Joarder stated that Velazquez expressed an interest in purchasing the Property and suggested to Joarder that he have the Property appraised.  Joarder obtained an estimate of $350,000 to purchase a new property and to relocate his business.  Velazquez offered a maximum purchase price of $150,000, which Joarder rejected.

CCIA characterized the Development Project as consisting of two stages: environmental remediation, followed by a revitalization project.  CCIA was aware the Redevelopment Area had environmental issues because it included property that a former dry-cleaning business had used.  CCIA, Marathon, and Enterprise Network Resolutions Contracting, LLC (Enterprise Network) performed the environmental remediation stage.  Community Health Care, Inc. d/b/a CompleteCare Health Network, Inc. (CompleteCare) and its contractor, Fabbri Builders, Inc. (Fabbri), did the revitalization project.

In 2013, CCIA retained T&M Associates to complete a preliminary assessment and site investigation of the Redevelopment Area.   T&M's

---

[5]  We glean this information from Velazquez's deposition; the record on appeal does not include this letter.

investigation and report—dated December 30, 2013—identified several environmental concerns, including: (1) an underground heating oil tank; (2) chlorinated hydrocarbons in the soil and groundwater in connection with the former dry-cleaning business; and (3) historic fill contaminants in the soil.[6]

Velazquez stated that, pursuant to New Jersey Department of Environmental Protection (NJDEP) directives, CCIA was required to perform environmental remediation of the Redevelopment Area. Velazquez acknowledged that CCIA was required to communicate with other property owners before engaging in remediation on their land. He alleged that either CCIA or its agents received verbal permission for any investigation and/or remediation work done on the Property, a claim Joarder disputes.

According to Stephen Nardelli, Fralinger's Vice President and Director of Engineering, on February 24, 2016, CCIA retained Fralinger to prepare a Certified Boundary & Topographic Survey.

In January 2017, CCIA retained Marathon to conduct environmental remediation on the Development Project. Marathon outlined its services as including: (1) sampling and analyzing soil from the Development Project by

---

[6] The record does not include a copy of T&M's report, but Marathon summarized T&M's findings in a letter to CCIA.

advancing soil borings around the Property; (2) sampling and analyzing groundwater by installing groundwater monitoring wells; and (3) performing a vapor intrusion investigation by collecting soil gas samples and, if those results were above acceptable screening levels, collecting indoor air samples.

In February 2017, Fralinger prepared a site plan for the Development Project. The site plan included the Property. Nardelli asserted that CCIA made representations and gave instructions to Fralinger for preparation of the site plan. Nardelli further asserted that with "large redevelopment projects," it was "common to include other property in preliminary site plans," and that "[t]he consent of the private property owners is not required and would not be the responsibility of the civil engineer preparing the preliminary site plan."

Joarder assumed that Fralinger employees must have trespassed on the Property to prepare the site plan and take measurements, although he had no direct knowledge of any such incursion by Fralinger. In plaintiffs' response to Fralinger's interrogatories, when asked to identify each alleged instance of physical trespass, professional negligence, and/or deviation from any professional standard of care, plaintiffs responded that they were "not certain as to which [d]efendant did what on and to [the] Property."

9

In its response to interrogatories, Fralinger stated that it did "not recall a physical entry onto [p]laintiffs' Property related to this Project, but acknowledged it is possible that a Fralinger employee was present on and/or in the area of the [p]laintiff's Property or Church Lane to conduct survey work."

Commenting on the Property's inclusion in the site plan, Velazquez stated that while the Property was not officially part of the Development Project, CCIA always intended to make improvements to the pizza shop's rear parking lot and dumpster area.

CCIA stated the Property initially was included in the Development Project to "coordinate the entire site and ensure that the entire site was upgraded to current standards and would provide upgraded parking, trash enclosure area, and pedestrian/vehicular movement throughout the site." Velazquez acknowledged that he was required to obtain Joarder's consent to include the Property in the Development Project and claimed that he had shown Joarder the site plan. He also claimed he told Joarder that the improvements would help the pizza shop's operations and offered to make these improvements regardless of whether CCIA purchased the Property. Velazquez said Joarder was "fine" with these improvements at the time but acknowledged that Joarder's consent was not in writing. It is unclear, moreover, when this purported conversation took place.

Joarder stated he did not recall seeing the site plan or Velazquez offering to make these improvements.

Marathon's principal scientist, Robert Carter, stated Marathon initially thought the undeveloped portion of the Property was part of the Development Project. This assumption was in part based on Marathon's review of the Fralinger site plan. Carter said he did not learn the Property was not part of the Development Project until after completion of the soil excavation and before the restoration stage. Regardless, Carter said CCIA was responsible for arranging access to the Property.

On or about February 20, 2017, Marathon took soil borings from the Property. Joarder stated he was not notified and never gave his permission for this testing. In its interrogatory responses, Marathon claimed that Velazquez gave verbal permission for these physical entries onto the Property. However, during his deposition, Carter did not recall whether Marathon obtained such permission.

Also, in February 2017, Marathon placed a "temporary well" on the Property. Carter did not recall whether Marathon received permission to install a temporary well.

11

On March 23, Kade Wojtal, a Marathon employee emailed Velazquez asking to access the Property on March 27 and 28, 2017, to take "near-slab" samples. Velaquez responded via email the next day, stating he spoke to the "owner" and that Marathon was "okay to proceed." Joarder did not recall this conversation.

On May 18, Marathon took "exterior soil vapor samples" from the Property. According to Velazquez, Marathon emailed him to access the Property for this testing. Velazquez responded that he had spoken with Joarder previously and Joarder was "aware of what we are trying to accomplish," but that he would call and follow-up with Joarder. Marathon represented that Velazquez gave permission for these entries via email. Joarder did not recall any such communication with Velazquez, and maintained this testing was done without his permission.

In August 2017, Marathon contacted Joarder requesting access to the shop to conduct indoor air sampling. Joarder stated that he received a "threatening phone call from Marathon," in which, Joarder asserted, a Marathon representative told him there were "environmental issues" with his business and if he did not test the building's air quality, his business could get "shut down." Joarder consented to the testing. He claimed this was the first time he learned

of any environmental issues with the Property. As Marathon explained in an email to Velazquez and Joarder, the testing consisted of placing air canisters inside the shop's building from August 29 to August 30, 2017.

On September 26, Marathon sent Mullica a letter notifying it of the test results. The letter explained that Marathon's investigation was in connection with the Development Project, and involved a remedial investigation of soil and groundwater impacts from the former dry-cleaning business on the adjacent lot. Marathon stated the groundwater samples collected from the temporary well points showed high concentrations of tetrachloroethene (PCE) and trichloroethene (TCE), above NJDEP standards. It reported that the May 2017 exterior soil vapor sampling and August 2017 indoor air sampling revealed high quantities of PCE, TCE, and chloroform, also above NJDEP standards. The letter outlined Marathon's remedial obligations, which included submitting a remedial action plan to the NJDEP within sixty days and beginning implementation of the plan within 120 days.

On October 10, Velazquez emailed Joarder to schedule an inspection with Marathon and Fran the Radon Man, LLC, to determine an appropriate

"mitigation system" to address the contaminants on the Property.[7]  It is unclear when this inspection occurred, but on October 31, Fran the Radon Man sent a letter to Marathon outlining its proposal for the installation of a vapor mitigation system at the pizza shop's building.  The scope of work included:  removing soil from the side wall foundation; drilling a four-and-a-half-inch hole through the block foundation to access area below the slab; installing a "[four-]inch schedule [forty] pipe" up the side of the building; mounting an inline duct fan at the exterior; and performing diagnostic testing.  Fran the Radon Man estimated that the associated electrical costs would total approximately $139 annually.

On November 14, Marathon sent NJDEP its mitigation plan letter for the Property, with a copy sent to plaintiffs.  The letter summarized the test results that indicated elevated PCE and TCE levels and outlined Marathon's plan to install a mitigation system to prevent vapor intrusion in the building.  The letter stated the "person responsible for conducting the mitigation may be required to reimburse" the Property owner for any electrical expenses incurred by the mitigation system.

---

[7]  The parties referred to this mitigation system interchangeably as an "active subsurface depressurization system" and a "vapor mitigation system."  For clarity, we refer to it as the "mitigation system."

On January 24, 2018, the City of Bridgeton's Planning Board approved the site plan for the Development Project, which provided "for the construction of office space, parking and associated improvements." The plan also required the "vacation of Church Lane and the adjacent alleyways," which, as the plan depicts, ran parallel to the Property.

On February 20, the City Council and CCIA entered into a "Redevelopment Agreement" for the Development Project, which included redevelopment of Block 84, Lots 7, 9, 10, 11, 12, 13 (the Property), and 13.01, and Block 85, Lots 1, 2, 3, 17, and 19. As part of the Redevelopment Agreement, CCIA purchased certain lots attached to the Development Project, but did not purchase the Property. The City Council adopted Resolution 57-18, approving the Redevelopment Agreement.

On March 19, Wojtal emailed Joarder about installation of the mitigation system by Fran the Radon Man. He wrote "that disturbance to business activities will be minimal" and they would try to conduct the work prior to business hours. The email referred to the November 14, 2017 letter to NJDEP as setting forth the outline of the proposed work.

A-2975-23

The installation of the mitigation system occurred in early April 2018 and was consistent with Fran the Radon Man's proposal to Marathon. CCIA paid for the installation.

Joarder asserted that the mitigation system was not the "minimal" intrusion or alteration that Marathon had represented. Joarder claims that Marathon never "adequately described the nature and scope of work," although Joarder acknowledged he did not ask questions about this or attempt to research this himself. Carter did not know whether Joarder received Fran the Radon Man's proposal that was sent to Marathon, or if Joarder was apprised of the full extent of the mitigation system installation.

On August 22, 2019, CCIA entered into a "Remediation Reimbursement Agreement" with CompleteCare. Pursuant to this agreement—which was connected to the sale of the Development Project to CompleteCare—CompleteCare agreed to reimburse CCIA for all funds expended in connection with remediation.

At some point during the remediation process, Enterprise Network installed chain link fencing and sedimentation control fencing on portions of the Development Project, including on the Property. While Velazquez claimed that

16

Enterprise Network had shared a sketch of the fencing with Joarder, Joarder claims no one discussed the fencing with him or sought his permission.

The fencing was installed in preparation for Marathon and Enterprise Network's excavation of contaminated soil from the Development Project, including from the Property. This excavation occurred in late-October, early November 2019. Velazquez claimed Enterprise Network and Marathon notified Joarder of this plan. Carter did not recall if any defendant obtained permission for the excavation. Joarder claims that no one requested his permission, and he did not know why the excavation took place.

Following the excavation, the Property was left with an area of depression. While the depression was backfilled, Carter stated it was intentionally left partially below grade because Marathon thought the Property was included in the Development Project's landscaping and parking lot plans.

After CompleteCare assumed ownership of the Development Project—but before the sale was finalized—on January 16, 2020, CompleteCare sought "written authorization" from Joarder, confirming he "consent[ed] to the development of [the pizza shop]'s parking facilities as shown on the site plan," which incorporated the shop's parking lot into the Development Project's parking lot, and offered improvements to the shop's trash enclosure.

17

CompleteCare's attorney, Howard D. Melnicove, met with Joarder on January 16 to discuss this issue. Following this meeting, Melnicove emailed Velazquez and CompleteCare employees, stating that Joarder claimed he never reached an agreement with CCIA about the Property's inclusion in the Development Project and that he was "not at all interested in having a portion of his lot developed in accordance with the site plan." Melnicove also reported that Joarder complained that "the entire rear of his property has been fenced off from the balance of his property and the surface of it has been removed and regraded—all without his consent or permission." Melnicove advised CompleteCare and CCIA to "[i]mmediately take steps" to remove the Property from the site plan.

In response to this email, Velazquez separately emailed Carter and Wojtal, asking whether they had "provide[d] notice to [the shop's owner] regarding the remediation"—other than for the vapor mitigation system—to see if Joarder was "misrepresenting the facts." Wojtal responded that there was "[r]emediation notification in form of a sign posted at the [P]roperty (associated with soil remediation)." In his deposition, Velazquez said that prior to Melnicove's communication, he thought Joarder had verbally consented to the improvements, and that he "was okay" with the redevelopment. Moreover, Velazquez noted that Joarder never contacted him to complain or object to any of the activity on

18

the Property, including the fencing or the excavation. Similarly, Velazquez said none of the contractors ever reported Joarder's denying them access to the Property.

Prior to the sale to CompleteCare, Fralinger prepared an updated site plan for the Development Project, which eliminated the planned development to the Property's parking lot and trash enclosure.

On March 16, 2020, CCIA sold all its interest and rights to the Development Project to defendant Bridgeton Redevelopment Qalicb Urban Renewal, LLC (Qalicb).[8]

On January 18, 2021, Wojtal emailed Velazquez and Carter, stating Joarder had made inquiries to Fralinger about the "backfilled excavation" in the parking lot. Wojtal noted that the excavation had been "backfilled, but the grade was left below street level," referring to the past expectation that the Property "would be part of the redevelopment plan parking lot/landscaping." He also noted that the area of depression was "pooling surface water and debris." Wojtal said Marathon recommended working with Fabbri to rectify this issue and "get certified clean fill and bring the area to grade as part of the site work on the redevelopment parcel."

---

[8] According to CCIA's appeal brief, Qalicb was a subsidiary to CompleteCare.

Fabbri extended this offer to Joarder via Joarder's attorney. Joarder declined, stating he was unwilling to repair the crater because he did not know the history of the excavation and digging of the crater. Thus, Joarder claimed, even if Fabbri "volunteered to smooth out and backfill [the] side lot for free," he "do[es] [not] know" if he would have accepted the offer.

On February 2 and 3, 2021, CompleteCare's attorney and plaintiffs' counsel exchanged several emails in which plaintiffs' counsel confirmed that plaintiffs did not agree to vacate their interest in the northern half of Church Lane. In a subsequent email dated February 9, 2021, CompleteCare's attorney provided an updated site plan to reflect plaintiffs' position on Church Lane and stated that the engineers "emphasize[d]" that this plan would render the annexed land "useless, unsightly, unimproved and a detriment to [the pizza shop's] business." After plaintiffs' counsel reiterated that plaintiffs wished to retain ownership of their share of the vacated church Lane, Fabbri requested Fralinger prepare a revised site plan based on these changes. Fralinger agreed.

Joarder stated that previously vehicles used Church Lane "for everything," including accessing the trash cans, customer parking, and employee parking. However, the Development Project blocked one end of Church Lane, meaning the Property could no longer use this street as an entry point. While the

20

Development Project added a curb cutout for entry to the parking lot from Laurel Street, Joarder stated the lot remained unusable following the soil excavation.[9] Joarder asserted that he lost eight or nine parking spaces. He noted he only had two parking spots in the front of the building, requiring his employees and customers to use street parking. Joarder also claims he had to move his dumpsters to the side of the Property to provide the trash company access to them. As a result, he claims he received tickets from the City regarding the dumpsters' placement.

Joarder identified that the Development Project had the following effects on the Property: soil excavation; installation of the mitigation system, which involved drilling a hole through his building; the continued presence of the mitigation system in the building, which uses his electricity; the excavation of his side lot; and limitations on parking and entry to the Property, due to the excavation. When asked about the extent of these effects, Joarder said he did not yet know, as the purpose of the litigation was to "discover" this, and that he needed expert help to fully assess them.

---

[9] While the record on appeal includes site plans, we cannot discern from the record exactly how the Development Project modified ingress and egress to the Property.

A-2975-23

Joarder acknowledged the pizza shop's profits were higher in 2020 and 2021 than in 2015, 2016, and 2017. He also acknowledged no one on the site reported that the remediation efforts adversely impacted the business. Joarder did not obtain an estimate for how much it would cost to restore the side lot to its prior condition. He acknowledged that if the crater/depression was filled and the dumpsters were moved, he could use the lot again by accessing the new cut out on Laurel Street. However, Joarder said he would not fill in the crater/depression because he had no details regarding the crater's status and excavation history.

Joarder also stated that CCIA never reimbursed him for the electrical costs related to the mitigation system. Velazquez acknowledged that a reimbursement clause was in the letter, and he agreed to pay for this expense.[10]

## II.

We next summarize the procedural history. On September 8, 2021, plaintiffs filed a complaint against defendants CCIA, Marathon, Fralinger, Enterprise Network, Fabbri, and CompleteCare. Plaintiffs alleged that

---

[10] During a court conference on February 28, 2024, Marathon represented that the mitigation system was still in place but had been shut down on January 18, 2024. The goal was to test the air and soil after thirty-days and "monitor how the environment is without the system running."

A-2975-23

defendants: (1) trespassed on the Property; (2) unlawfully put up chain-link fencing, which interfered with use of their parking area; (3) installed active subsurface depressurization systems to remediate environmental contamination from the Development Project; (4) excavated the parking lot, leaving a "dangerous crater" on the Property; (5) installed soil erosion and sedimentation control fencing; (6) cut electrical service to the building; (7) stored construction materials on the Property; (8) placed "No Trespassing" signs, interfering with access to the Property; and (9) excavated the sidewalk along the front of the property.

Count one of plaintiffs' complaint alleged an inverse condemnation action against CCIA, claiming it engaged in a taking of the Property without just compensation. In count two, plaintiffs alleged negligence against the other defendants. Plaintiffs alleged Fralinger negligently included the Property in the site plan for the Development Project and was responsible for designing the soil erosion and sedimentation control fencing for the Development Project. Plaintiffs alleged Marathon trespassed on the Property and engaged in environmental remediation without plaintiffs' permission. Plaintiffs alleged Enterprise Network was negligent in its excavation of a "substantial portion" of the Property's parking area, leaving behind a "crater." Plaintiffs alleged Fabbri

23

posted "No Trespassing" signs, cut off electrical services to the building, and placed fencing in the front of the Property, all without plaintiffs' permission. Plaintiffs also asserted that the current owner of the property, CompleteCare, was now responsible for the actions of the other defendants.

In count three, plaintiffs alleged that all defendants trespassed on the Property. Plaintiffs therefore requested damages, punitive damages, and attorney's fees and costs against all defendants.

On April 1, 2022, Fralinger moved for summary judgment against plaintiffs. Marathon and CompleteCare also moved for summary judgment against plaintiffs.[11]

On May 27, 2022, the trial court heard oral argument on the motions. The court concluded that because plaintiffs failed to file an affidavit of merit to support an allegation of professional negligence, as required by N.J.S.A. 2A:53A-27, plaintiffs could not raise a claim of professional negligence against any defendant. However, the court otherwise concluded that plaintiffs had alleged sufficient facts to support their other causes of action against

---

[11] We note their applications are not included in the appellate record.

defendants—including ordinary negligence—and thus denied the summary judgment motions.

On June 29, 2022, Fralinger sent plaintiffs a "safe harbor" letter pursuant to Rule 1:4-8 and N.J.S.A. 2A:15-59.1, stating that plaintiffs could not support a cause of action against Fralinger, and thus requesting plaintiffs withdraw their claims against it within twenty-eight days of service.

Following discovery, on July 28, 2023, Fralinger filed a second motion for summary judgment against plaintiffs, which the court granted on August 25.

On September 13, 2023, Fralinger moved for frivolous litigation sanctions against plaintiffs. On October 20, the court entered an oral decision granting this application. The court directed Fralinger's counsel to submit their certification of legal services. Fralinger complied on November 6, requesting fees and sanctions totaling $89,072.19.

On November 27, CCIA moved for summary judgment against plaintiffs. Marathon and Enterprise Network joined this motion and cross-moved for summary judgment against CCIA (as their indemnifier), although their applications are not part of the appellate record.

On December 5, the trial court awarded Fralinger $30,000 in attorney's fees and sanctions.

On January 9, 2024, plaintiffs opposed the summary judgment motions filed by CCIA, Marathon, and Enterprise Network, and cross-moved for partial summary judgment against CCIA, requesting a finding that CCIA had engaged in a "taking" of the Property.

The trial court heard oral argument on these motions. On March 6, the court granted CCIA's motion for summary judgment and denied plaintiffs' cross-motion for partial summary judgment. In reaching that conclusion, the court noted that plaintiffs had released their claims against CompleteCare and the defendants who were involved with the construction of the CompleteCare project. Consequently, it reasoned, plaintiffs had relinquished their claims regarding temporary fencing, electrical service outage, the posting of a No Trespassing sign adjacent to the Property, and another excavation of the area in front of the Property. Thus, the court held, plaintiffs' claims against CCIA were "limited to any 'intrusions' related to the environmental investigation and remediation."

The trial court acknowledged that the remedial work affected the Property, noting that it previously was "somewhat landscaped," but following remediation, was left as an "ungraded, cratered, and war-torn looking property." The court stated there was a dispute about whether plaintiffs ever received notice

26

of the work, although it stated that some of the emails "arguably confirm[ed]" that Joarder had received some notice. Moreover, it noted that Joarder had agreed to the installation of the mitigation system, and "recently signed off again to further indoor testing and removal of the system if all vapor samples come back 'clean.'"

However, the trial court emphasized that Joarder never objected to the work, never sought out information regarding the work, never engaged in his own inquiries regarding the need for remediation and how it impacted his employees and never sought to ascertain the scope of the work. Moreover, it noted that Joarder could not identify the harmful effects that remediation had on his business and instead testified that his business receipts had increased.

The trial court concluded that CCIA's intrusions on the Property did not constitute a taking because the entries were done for purposes of environmental remediation, which benefited both the public and plaintiffs. The Property "was contaminated with harmful chemicals that were seeping into the ground water," and the State was "authorized to clean up public hazards for the benefit of the public good." The court found that plaintiffs had "no right to exclude governmental entities who engage in the remediation of dangerous chemical pollution."

27

In reaching this conclusion, the trial court reviewed the United States Supreme Court's inverse condemnation decision in <u>Cedar Point Nursery v. Hassid</u>, 594 U.S. 139 (2021). The court emphasized that <u>Cedar Point Nursery</u> outlined certain exceptions that did not constitute a taking, such as isolated trespasses, and government-authorized invasions "consistent with longstanding background restrictions on property rights," including the need "to access private property in the event of public or private necessity." (Citing <u>Cedar Point Nursery</u>, 594 U.S. at 139 and <u>Loretto v. Teleprompter Manhattan CATV Corp.</u>, 458 U.S. 419 (1982)). In addition, while the court acknowledged that there was some harm done to the Property, insofar as it was left "visually . . . inferior to what it was before," it found plaintiff also "was the beneficiary of [defendant]'s actions," and "now has a clean, marketable property," with their workers "no longer exposed to harmful chemical vapors."

The trial court agreed there was no written agreement between the parties for the environmental remediation, as required by N.J.S.A. 58:10B-16,[12] but

---

[12] The Spill Act governs remediation responsibilities with respect to hazardous discharge sites. <u>See</u> N.J.S.A. 58:10B-1 to -31. N.J.S.A. 58:10B-1.3(a) imposes a duty on a property owner to "remediate the discharge of a hazardous substance." N.J.S.A. 58:10B-16 authorizes the hazardous property owner to engage in "necessary remediation" on property that it does not own, so long as there is a written agreement between "the person conducting the remediation

A-2975-23

found the statute authorized a court to "permit reasonable access in a circumstance similar to that which is present here."  The court concluded that the email chains provided plaintiffs with notice of the remediation activities, and that plaintiffs' inaction constituted acquiescence to CCIA's conduct.  Moreover, the court found that "[a] violation of the written requirement of the statute does not imply that a taking has occurred."  Thus, the court concluded that plaintiffs failed to sufficiently allege that a taking had occurred and granted summary judgment to CCIA on plaintiffs' count one, the inverse condemnation action.  For the same reasons, the court denied plaintiffs' summary judgment motion.

On March 26, 2024, plaintiffs moved for reconsideration of the trial court's orders:  (1) awarding sanctions to Fralinger; (2) granting CCIA summary judgment against plaintiffs; and (3) denying plaintiffs' motion for partial summary judgment.  On April 18, Fralinger opposed plaintiffs' motion for reconsideration and cross-moved for reconsideration of the December 5, 2023 order awarding it less in attorney's fees than it had requested.

---

and the owner of the property authorizing the entry onto the property."  N.J.S.A. 58:10B-16(a)(1).  If they do not agree, then "the person undertaking the remediation shall seek an order from the Superior Court directing the property owner to grant reasonable access to the property and the court may proceed in the action in a summary manner."  Ibid.

On May 7, the trial court heard oral argument on the reconsideration motions. Plaintiffs argued that the court erred because CCIA's conduct was not an "isolated physical invasion" but "a long term tak[ing] of the [P]roperty." Plaintiffs also argued that CCIA's conduct did not qualify as one of the exceptions to takings as articulated in Cedar Point Nursery because CCIA did not comply with its obligations under the Spill Act. Moreover, plaintiffs argued the court wrongfully framed the remediation as a benefit to them, because CCIA was obligated to remediate the Property and pay for those expenses. In addition, plaintiffs argued that they clearly suffered damages because the Property was left "disturbed and . . . in a condition that's inferior than it was before."

Following oral argument, the trial court denied both motions for reconsideration. The court concluded that plaintiffs failed to demonstrate that it overlooked or misapplied the law, or that its decision was palpably incorrect or irrational.

Plaintiffs' appeal and Fralinger's cross-appeal followed. To summarize the parties' contentions raised on appeal, we reproduce the point headings from their appeal briefs.

Plaintiffs argue:

POINT I

THE TRIAL COURT ERRED IN DISMISSING [PLAINTIFFS'] COMPLAINT AGAINST THE CCIA AND DENYING PLAINITFFS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

    A.  Standard of Review

    B.  The Unauthorized Entries and Excavation of Plaintiffs' Property by [CCIA] Constituted a Taking for Which Plaintiffs are Entitled to Just Compensation

POINT II

THE TRIAL COURT ERRED IN FINDING THAT PLAINTIFFS' CLAIMS AGAINST [FRALINGER] WERE FRIVOLOUS

Plaintiffs also argue the following in their reply brief:

POINT I

THE CCIA'S CLAIM THAT [PLAINTIFFS] BENEFITTED FROM THE UNAUTHORIZED ACTIVITIES OF THE CCIA AND ITS AUTHORIZED AGENTS LACKS MERIT

POINT II

FRALINGER'S ARGUMENT THAT PLAINTIFFS' LITIGATION WAS FRIVOLOUS DUE TO THEIR "PRESUIT" KNOWLEDGE LACKS MERITS

31

POINT [III]

THE TRIAL COURT DID NOT ERR IN REDUCING
THE AWARD OF SANCTIONS BASED UPON THE
UNREASONABLE AMOUNT OF TIME SPENT ON
THE MATTER

Fralinger raises the following contentions on cross-appeal:

POINT I

THE TRIAL COURT DID NOT ERR IN FINDING
THAT PLAINTIFFS' CLAIMS AGAINST
FRALINGER WERE FRIVOLOUS

1. Plaintiffs' Negligence Claims Were
Frivolous

2. Plaintiffs' Trespass Claim Against
Fralinger Was Frivolous

POINT II

THE TRIAL COURT ERRED IN NOT AWARDING
FRALINGER ITS FULL FEE AWARD

In addition, Fralinger argues in its reply brief:

POINT I

PLAINTIFFS' LAWSUIT AGAINST FRALINGER
WAS FRIVOLOUS

A. PLAINTIFFS HAD PRE-SUIT
KNOWLEDGE THAT FRALINGER
MODIFIED THE SITE PLANS TO
EXCLUDE THE PROPERTY FROM THE
REDEVELOPMENT PROJECT

32

B. EVEN IF PLAINTIFFS' LAWSUIT AGAINST FRALINGER WAS COMMENCED IN GOOD FAITH, IT WAS MAINTAINED IN BAD FAITH AFTER SERVICE OF FRALINGER'S SAFE HARBOR LETTER

<u>POINT II</u>

FRALINGER IS ENTITLED TO ITS FULL FEE AWARD

Finally, CCIA makes the following contentions:

<u>POINT I</u>

PLAINTIFFS' BASIS FOR APPEAL DOES NOT MEET THE STANDARD UNDER THE INTERESTS OF JUSTICE AND SHOULD THEREFORE BE DENIED

A. STANDARD OF REVIEW

B. PLAINTIFFS FAILD TO QUANTIFY DAMAGES AS TO JUST COMPENSATION, AND INSTEAD RECEIVED A SUBSTANTIAL BENEFIT FROM THE AUTHORITY

III.

We first address plaintiffs' contention the trial court erred in granting summary judgment in CCIA's favor. We begin our analysis by acknowledging the governing legal principles, starting with the standard of our review. We review a trial court's summary judgment decision de novo, <u>DeSimone</u>, 256 N.J.

33

at 180, applying the same standard as the trial court.  Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016). Importantly, "[t]he court's function is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'"  Rios v. Meda Pharm., Inc., 247 N.J. 1, 13 (2021) (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995)).

A non-moving party "cannot defeat a motion for summary judgment merely by pointing to any fact in dispute."  Brill, 142 N.J. at 529.  Rather, "once the moving party presents sufficient evidence in support of the motion, the opposing party must 'demonstrate by competent evidential material that a genuine issue of fact exists[.]'"  Globe Motor Co. v. Igdalev, 225 N.J. 469, 479-80 (2016) (alteration in original) (quoting Robbins v. Jersey City, 23 N.J. 229, 241 (1957)).

Further, "when the evidence 'is so one-sided that one party must prevail as a matter of law,' . . . the trial court should not hesitate to grant summary judgment."  Brill, 142 N.J. at 540 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).  That said, we view the evidence in a summary judgment motion in the light most favorable to the non-moving party.  Harz v. Borough of Spring Lake, 234 N.J. 317, 329 (2018).  We thus give the non-moving party "the

34

benefit of the most favorable evidence and most favorable inferences drawn from that evidence." Gormley v. Wood-El, 218 N.J. 72, 86 (2014); see also R. 4:46-2(c). Furthermore, we "accord no 'special deference' to the 'trial court's interpretation of the law and the legal consequences that flow from established facts.'" Cherokee LCP Land, LLC v. City of Linden Plan. Bd., 234 N.J. 403, 414-15 (2018) (quoting Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

With respect to the power of eminent domain, "[t]he New Jersey Constitution provides protections against governmental takings of private property without just compensation, coextensive with the Takings Clause of the Fifth Amendment of the United States Constitution." Klumpp v. Borough of Avalon, 202 N.J. 390, 405 (2010) (citing Mansoldo v. State, 187 N.J. 50, 58 (2006)). Moreover, the Fifth Amendment Takings Clause "applies to the States through the Fourteenth Amendment." 257-261 20th Avenue, Realty, LLC v. Roberto, 259 N.J. 417, 437-38 (2025) (citing Tyler v. Heenepin County, Minnesota, 598 U.S. 631, 637 (2023)).

"An inverse condemnation proceeding is one through which a land-owner seeks compensation for a de facto taking of their property." Pinkowski v. Township of Montclair, 299 N.J. Super. 557, 575 (App. Div. 1997) (citing

Johnson v. Essex County, 223 N.J. Super. 239, 258 (L. Div. 1987)).  "A constitutional taking may occur by a physical taking, . . . in which the government authorizes a physical occupation of the property, or a regulatory taking."  Simmons v. Loose, 418 N.J. Super. 206, 233 (App. Div. 2011) (citing Klumpp, 202 N.J. at 405).  "To accomplish a physical taking the government may either enter the land without authorization or exercise its power of eminent domain through a condemnation proceeding."  Id. at 233 (quoting Klumpp, 202 N.J. at 405-06).

New Jersey courts have consistently held that "[t]emporary physical limitations are not per se takings," because such temporary measures do not "absolutely dispossess the owner of [their] rights to use, and exclude others, from [their] property."  Id. at 234 (quoting Loretto, 458 U.S. at 435 n.12).  In Loretto, 458 U.S. at 434, the Supreme Court reviewed "the constitutional distinction between a permanent occupation and a temporary physical invasion." It noted "[n]ot every physical invasion is a taking," and that temporary intrusions triggered "a more complex balancing process to determine" whether a taking had occurred.  Id. at 435 n.12.  In Cedar Point Nursery, 594 U.S. at 153, the Supreme Court clarified "that a physical appropriation is a taking whether it is permanent

36

or temporary." Thus, the Court explained, "the duration of the appropriation bears only on the amount of compensation due." Ibid.

IV.

Applying the foregoing principles, we conclude that summary judgment for neither party on the trespass/inverse condemnations claims is appropriate. See Cent. Paper Distrib. Servs. v. Int'l Rec. Storage & Retrieval Serv., Inc., 325 N.J. Super. 225, 232 (App. Div. 1999) (explaining that legal questions dependent upon the operative facts should not be decided by summary judgment when those facts are in dispute). Our de novo review of the record shows that there are factual disputes pertaining to the critical question of whether plaintiffs granted a right of access to CCIA in exchange for the benefit of remediation.

Here, plaintiffs' suit rests on Joarder's claim that he had no notice of environmental remediation until Marathon contacted him about the indoor air sampling. Even then, he stated, no one explained to him why such testing was necessary or that it was in connection with environmental concerns arising from the former dry-cleaning business. Joarder further claimed that the remediation efforts also resulted in multiple unauthorized entries onto the Property and he only gave permission for two of those entries—for the indoor air sampling and to install the mitigation system. As for the other alleged trespasses, he said he

did not know the details of those intrusions, including when they took place, by which defendant, and for what purpose. In his view, all defendants were responsible, and the purpose of the litigation was to determine the extent of their responsibility.

More specifically, the record shows that the parties dispute whether there was consent for several entries onto the Property in 2017, including in February 2017 for the soil samples and installation of a temporary well, in March 2017 for new-slab soil samples, and in May 2017 for exterior soil vapor samples. The parties also dispute whether there was any consent for the soil excavation in the Property's parking lot.

In reaching this conclusion, we express no opinion as to the parties' factual assortations and the ultimate outcome. See footnote 4. Our task in this appeal is limited to determining whether material factual issues are disputed, not to resolve any such disputes as a trier of fact. See Gilhooley v. County of Union, 164 N.J. 533, 545 (2000) (stating that when weighing a summary judgment motion, the trial court's function is not "to weigh the evidence and determine the outcome but only to decide if a material dispute of fact exist[s]"). We are convinced, moreover, that the question of whether Joarder was aware of and

assented to the entries upon the Property is material, indeed critical, to both the trespass and taking claims.

In these circumstances, it would be premature to definitively rule on the constitutional taking claims. See State v. J.H.P., 478 N.J. Super. 262, 283 (App. Div. 2024) ("As a general rule, our courts strive to avoid reaching constitutional issues unless they are 'imperative to the disposition of the litigation.'" (quoting Strategic Env't Partners, LLC v. N.J. Dep't of Env't Prot., 438 N.J. Super. 125, 147 (App. Div. 2014))). See also State v. Hawkins, 461 N.J. Super. 556, 565 (App. Div. 2019) ("We should not decide constitutional issues unless it is necessary to resolve the case before us." (citing O'Keefe v. Passaic Valley Water Comm'n, 132 N.J. 234, 240 (1993))). We therefore are constrained to remand for trial.

V.

We turn next to plaintiffs' contention that the court erred in finding plaintiffs' negligence complaint against Fralinger to be frivolous and in granting Fralinger's request for sanctions. N.J.S.A. 2A:15-59.1 "permits a court to award reasonable counsel fees and litigation costs to a prevailing party in a civil action if the court determines 'that a complaint, counterclaim, cross-claim or defense of the non[-]prevailing person was frivolous.'" Toll Bros, Inc. v. Twp. of West

Windsor, 190 N.J. 61, 67 (2007) (citing N.J.S.A. 2A:15-59.1(a)(1)). Under the statutory framework, a claim is deemed frivolous if it was "commenced, used or continued in bad faith, solely for the purpose of harassment, delay or malicious injury," N.J.S.A. 2A:15-59.1(b)(1), or if the party should have known that the claim "was without any reasonable basis in law or equity and could not be supported by a good faith argument for an extension, modification or reversal of existing law." N.J.S.A. 2A:15-59.1(b)(2).

Rule 1:4-8 similarly authorizes sanctions against an attorney. Toll Bros, Inc., 190 N.J. at 68. Rule 1:4-8(a) provides that a party/attorney signing a pleading must certify that: (1) the pleading is not presented for an improper purpose; (2) the claims therein are warranted by existing law or present non-frivolous arguments to extend, modify, or enact new law; (3) the factual allegations have evidentiary support or likely have evidentiary support and will be withdrawn or corrected pursuant to further discovery; and (4) the denial of factual allegations are warranted based on the evidence available and will be withdrawn or corrected pursuant to further discovery. It also provides that an adverse party may seek sanctions for failure to comply with this rule. R. 1:4-8(a)-(b).

"A litigant seeking sanctions under the Rule must file a separate motion describing the specific conduct alleged to be a violation of the Rule." Toll Bros. Inc., 190 N.J. at 69 (citing R. 1:4-8(b)(1)). The litigant must serve a written notice and demand on the attorney, requesting that the frivolous claim be withdrawn. Ibid. (citing R. 1:4-8(b)(1)). This "safe harbor" letter serves as notice that the litigant will apply for sanctions. Ibid. (citing R. 1:4-8(b)(1)).

The statute and Court Rule authorize a "limited exception[] to the 'American Rule' for civil justice, whereby litigants are expected to bear their own counsel fees." Bove v. AkPharma, Inc., 460 N.J. Super. 123, 147 (App. Div. 2019). Given this general preference, courts "approach[ ] fee-shifting requests under the Frivolous Litigation Statute and Rule 1:4-8 restrictively." Ibid. This restrictive approach reflects the general policy that "the right of access to the court should not be unduly infringed upon, honest and creative advocacy should not be discouraged, and the salutary policy of the litigants bearing, in the main, their own litigation costs, should not be abandoned." Ibid. (quoting Gooch v. Choice Entertaining Corp., 355 N.J. Super. 14, 18 (App. Div. 2002)).

A trial court's decision to grant frivolous lawsuit sanctions is reviewed under an abuse of discretion standard. Borough of Englewood Cliffs v. Trautner,

478 N.J. Super. 426, 37 (App. Div. 2024) (citing <u>Wolosky v. Fredon Township</u>, 472 N.J. Super. 315, 327 (App. Div. 2022)).  An abuse of discretion exists "when a decision is made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis."  <u>Ibid.</u> (quoting <u>Flagg v. Essex Cnty. Prosecutor</u>, 171 N.J. 561, 571 (2002).  Thus, "[r]eversal is warranted 'only if [the decision] was not premised upon consideration of all relevant factors, was based upon consideration of irrelevant or inappropriate factors, or amounts to a clear error in judgment.'"  <u>Bove</u>, 460 N.J. Super. at 126 (quoting <u>McDaniel v. Man Wai Lee</u>, 419 N.J. Super. 482, 498 (App. Div. 2011)).  <u>See also</u> <u>Pitney Bowes Bank, Inc. v. ABC Caging Fulfillment</u>, 440 N.J. Super. 378, 383 (2015) (noting that "a trial court's reconsideration decision will be left undisturbed unless it represents a clear abuse of discretion" (citing <u>Hous. Auth. of Morristown v. Little</u>, 135 N.J. 274, 283 (1994))).

Here, the trial court found plaintiffs made no other efforts to "flesh out whether or not they had a valid claim against . . . Fralinger," by failing to seek other discovery from Fralinger or depose its employees.  The court added that Fralinger's involvement was limited to preparing the site plans, and plaintiffs failed to demonstrate any damages stemming from those plans.  In sum, the trial court concluded in its initial decision that plaintiffs' conduct was sanctionable

because they pursued their litigation against Fralinger without any facts to support their claim against it. In its May 10, 2024 reconsideration oral decision, the court reiterated its conclusion that plaintiffs' claims against Fralinger were baseless, as there was no proof of trespass by Fralinger employees.

We see no abuse of discretion in the trial court's conclusion that plaintiffs' claims against Fralinger were frivolous. We are satisfied the trial court's ruling was not based on bad faith for purposes of harassment, delay, or injury, N.J.S.A. 2A:15-59.1(b)(1), but rather on its finding that plaintiff's professional negligence and ordinary negligence claims were "not supported by any credible evidence." Bove, 460 N.J. Super. at 148 (quoting United Hearts, LLC v. Zahabian, 407 N.J. Super. 379, 389 (App. Div. 2009)). See also N.J.S.A. 2A:15-59.1(b)(2) (explaining that a frivolous claim "was without any reasonable basis in law or equity and could not be supported by a good faith argument for an extension, modification or reversal of existing law"). The court aptly noted that plaintiffs never obtained evidence to support these claims even after receiving the safe harbor letter.

Considering the totality of the circumstances, we see no error in the trial court's conclusion that Fralinger was entitled to frivolous litigation fees and costs.

43

## VI.

That brings us, finally, to Fralinger's contention raised in its cross-appeal that the trial court erred in awarding fees in an amount less than it requested. The gravamen of Fralinger's argument is that the trial court failed to provide a proper summary of its accounting.

"[A] reviewing court will disturb a trial court's award of counsel fees 'only on the rarest of occasions, and then only because of a clear abuse of discretion.'" Litton Indus., Inc. v. IMO Indus., Inc., 200 N.J. 372, 386 (2009) (quoting Packard-Bamberger & Co. v. Collier, 167 N.J. 427, 444 (2001)). Thus, a reviewing court should intervene "[w]here the lower court's determination of fees was based on irrelevant or inappropriate factors, or amounts to a clear error in judgment." Garmeaux v. DNV Concepts, Inc., 448 N.J. Super. 148, 155-56 (App. Div. 2016) (citing Masone v. Levine, 382 N.J. Super. 181, 193 (App. Div. 2005)).

When determining the amount of fees awarded, the court "must ascertain the 'lodestar'; that is, the 'number of hours reasonably expended by the successful party's counsel in the litigation, multiplied by a reasonable hourly rate." Id. at 159 (quoting Litton Indus., Inc., 200 N.J. at 386). That foundational standard applies, "[r]egardless of the source authorizing fee shifting." Grow Co., Inc. v.

44

Chokshi, 424 N.J. Super. 357, 367 (App. Div. 2012) (citing Litton Indus., Inc., 200 N.J. at 386).

To determine the reasonableness of the fees, the Rules of Professional Conduct require courts to consider:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
>
> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
>
> (3) the fee customarily charged in the locality for similar legal services;
>
> (4) the amount involved and the results obtained;
>
> (5) the time limitations imposed by the client or by the circumstances;
>
> (6) the nature and length of the professional relationship with the client;
>
> (7) the experience, reputation, and ability of the lawyer or lawyers performing the services;
>
> (8) whether the fee is fixed or contingent.
>
> [RPC 1.5(a).]

To inform and assist this process, the attorney seeking the fee award must submit a "certification of services that is sufficiently detailed to enable the court to

45

accurately calculate the lodestar." Walker v. Giuffre, 209 N.J. 124, 131 (2012) (citing Rendine v. Pantzer, 141 N.J. 292, 337 (1995)).

Further, when considering a fee award under Rule 1:4-8, "reasonable fees may be awarded only from that point in the litigation at which it becomes clear that the action is frivolous." Wolosky, 472 N.J. Super. at 328 (quoting LoBiondo v. Schwartz, 199 N.J. 62, 99 (2009)). Trial courts are "instructed . . . to analyze in detail an attorney's calculation of the number of hours reasonably expended," as "the amount of time actually expended" does not necessarily reflect "the amount of time reasonably expended." Hansen v. Rite Aid Corp., 253 N.J. 191, 216 (2023) (quoting Rendine, 141 N.J. at 335).

Fralinger filed its certification of legal services on November 6, 2023. Fralinger argued that its expenses pre-dated June 29, 2022 and calculated that its professional fees for the period in question totaled $89,072.19. Its hourly rate was based on $315 per hour for a partner, $210 per hour for an associate, and $100 per hour for a paralegal.

On December 5, 2023, the trial court granted Fralinger sanctions in the amount of $30,000. In reducing the fee, the court did not dispute the reasonableness of Fralinger's counsel's rates but rather questioned the "hours

expended throughout this billing period." Specifically, the court disputed the reasonableness of:

> (1) 82.4 hours billed for a second motion for summary judgment that was very similar to the first motion for summary judgment filed, (2) 74.6 hours billed for preparing and attending [three] depositions lasting approximately 14 hours, (3) 35.3 hours for the motion for sanctions, (4) 6.3 hours for litigation reports to the [insurance] carrier.

The court also noted that the services primarily were billed by counsel, not support staff, and thus generally questioned "the reasonableness of the time expended and billed." The trial court thus reduced Fralinger's fee request from $89,072.19 to $30,000.[13]

We see no abuse of discretion in the trial court's conclusions that the expenses were unreasonable. Cf. Rendine, 141 N.J. at 335 (cited approvingly to cases involving reduction of fees for hours that are "excessive, redundant, or otherwise unnecessary") (quoting Rode v. Dellarciprete, 892 F.2d 1177, 1183 (3d Cir. 1990))).

We are concerned, however, with the final award of $30,000. In Grow Co., Inc., 424 N.J. Super. at 365, the trial judge provided a thorough explanation

---

[13] We note that Fralinger does not challenge the trial court's ruling limiting the fee award for costs incurred between June 29, 2022 and October 20, 2023.

as to why it reduced the attorney fee award.  In <u>Hansen</u>, 253 N.J. at 221, the trial court provided a detailed opinion and spreadsheet to explain the reduction in the fee award.  We note that neither <u>Hansen</u> nor <u>Grow Co, Inc.</u> mandated other courts to engage in similar procedures when analyzing a fee award.  Nor would it be practical to insist on such detailed analysis in every case.  Indeed, in <u>Grow Co., Inc.</u>, we commented that the accounting method that was employed was "unusual."  424 N.J. Super. at 366.

That said, it is unclear how the trial court in this case reached a final award of $30,000.  The round number chosen by the trial court seems more akin to a compromise verdict than an accounting based on a determination of the number of hours reasonably spent multiplied by a reasonable hourly rate or rates.  Accordingly, we remand for the limited purpose of having the trial court explain in more detail how it arrived at the final frivolous litigation fee award to Fralinger.  In determining the amount of fees to award Fralinger, the court shall consider RPC 1.5(a)'s factors.  Further, it is charged to make specific factual findings.  <u>Rule</u> 1:7-4.  The trial court may, in its discretion, revise the final figure based on the more specific accounting.

A-2975-23

Affirmed in part and reversed and remanded in part for proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M. C. Harley

Clerk of the Appellate Division

49                                                           A-2975-23